Steve W. Berman (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

Ben M. Harrington (313877)
Benjamin J. Siegel (256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: benh@hbsslaw.com
Email: bens@hbsslaw.com

*Attorneys for Plaintiffs and
the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND/SAN FRANCISCO DIVISION

| | |
|---|---|
| MARY McQUEEN and VICTORIA BALLINGER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, INC., a Delaware corporation,<br><br>Defendant. | No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, UNJUST ENRICHMENT, AND NEGLIGENCE<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................1

II.  JURISDICTION AND VENUE .............................................................................3

III.  PARTIES ...............................................................................................................4

    A.  Plaintiffs ....................................................................................................4

    B.  Defendant ...................................................................................................6

IV.  FACTUAL ALLEGATIONS .................................................................................7

V.  CLASS ACTON ALLEGATIONS .......................................................................38

VI.  CLAIMS FOR RELIEF ........................................................................................42

FIRST CAUSE OF ACTION VIOLATION OF CALIFORNIA'S UNFAIR
    COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200) .........................42

SECOND CAUSE OF ACTION NEGLIGENCE AND NEGLIGENCE PER SE .........................43

THIRD CAUSE OF ACTION UNJUST ENRICHMENT .............................................45

PRAYER FOR RELIEF ..................................................................................................46

JURY TRIAL DEMANDED ...........................................................................................47

For their Complaint against Defendant Amazon.com, Inc. ("Amazon"), Plaintiffs, on their own behalf and on behalf of all others similarly situated, allege as follows:

## I.    INTRODUCTION

1.     California law rightly prohibits profiteering from a public health crisis.  In enacting some of the nation's strongest prohibitions on price gouging, California's legislature recognized that unscrupulous sellers can take advantage of emergency conditions to overcharge consumers for goods that are vital to their health, safety, general welfare, and normal daily lives.  Exploiting consumers in their most vulnerable hour is not only contrary to basic human decency—it is a criminal offense in California and presumptively unlawful under California's Unfair Competition Law.  *See* Cal. Penal Code §§ 396(h), (i).

2.     With this action, Plaintiffs seek to hold Amazon accountable for its unlawful price increases during the COVID-19 pandemic.

3.     In these unprecedented times, many American consumers have experienced their first taste of scarcity and financial distress, and for vulnerable Americans who already live on the precipice, things have gotten demonstrably worse.  In the wake of the outbreak and spread of COVID-19, essential consumer goods have disappeared (or appear unpredictably) on retails shelves, and shoppers must often wait hours to enter popular brick-and-mortar retail outlets in the hopes that supplies have been restocked.

4.     With "stay-at-home" orders prevailing across the country, and medical experts repeatedly warning about the ease of infection should Americans congregate in public, consumers also know that any retail excursion could have perilous consequences for themselves or loved ones, no matter what precautions are taken.  Officials with the Centers for Disease Control ("CDC") have cautioned that leaving the home is particularly dangerous for the elderly and those with preexisting medical conditions.  And for those Americans who are COVID-19 positive (even if asymptomatic), or who believe they have been exposed to COVID-19, venturing outside the home to make retail purchases comes with a high risk of spreading this extremely contagious and deadly disease to their neighbors and community.

1     5.     In this environment—consistent with the directions of government and public health officials—consumers have understandably turned to online purchasing, and Amazon in particular, to fulfill their essential needs.  Without venturing into public and risking exposure to themselves and others, with just a few clicks Americans can purchase consumer goods from Amazon that will be delivered to their homes.  Indeed, Amazon's sales have never been higher, and since the COVID-19 pandemic began, its sales in some categories (*e.g.*, home items) are ***up more than 1,000 percent***.[1]  But Amazon's position as a vital seller in times of contagion does not place it above the law.  If anything, the increased demand for its platform makes price gouging by Amazon all the more unconscionable.  Like every seller, Amazon has an obligation under California law to ensure that its pricing does not exploit consumers facing emergency conditions.  Amazon has not abided by that obligation.  In fact, as the COVID-19 crisis has escalated, so too have Amazon's prices for the goods consumers require to remain healthy, protected, and nourished.  Just by way of example, after COVID-19 was declared a public health emergency by California officials, certain Amazon prices increased as follows:

- **Face Masks**:  Increases exceeding ***500 percent***, from less than $20 to $120;
- **Pain Reliever**:  Increases of ***233 percent***, from $18.75 to $62.40;
- **Cold Remedies:**  Increases up to ***674 percent***, from $4.65 to $35.99;
- **Black Beans:**  Increases up to ***672 percent***, from $3.17 to $24.50;
- **Flour:** Increases up to ***400 percent***, from $22.00 to $110.00;
- **Disinfectants:**  Increase of ***100 percent***, from $14.99 to $29.99.

6.     All of these (and many more) Amazon price increases are flagrantly unlawful under California law, which makes presumptively illegal any price increase exceeding ***10 percent*** during a state or local emergency.  *See* Cal. Penal Code § 396(b).  Many of Amazon's price increases exceeded the statutory threshold by more than ***600 percent***.  Some of the unlawful increases were on sales of products supplied by third parties, sales which Amazon controls and reaps huge profits from.

---

[1] *See* https://www.wsj.com/articles/amazon-struggles-to-find-its-coronavirus-footing-its-a-time-of-great-stress-11585664987, last visited April 21, 2020.

Amazon is the functional seller of these products and is responsible when price-gouged sales violate the law.  But in addition, Amazon has inflated prices on its own inventory of products, which Amazon supplies and sells directly to consumers.  A study by the Public Interest Research Group ("PIRG") shows that, in February 2020, Amazon increased those prices by more than 50 percent on one-sixth of public health products used to combat COVID-19.[2]  And perhaps most troublingly, Amazon has maintained its unlawfully high prices on many essential items while publicly trumpeting its efforts to prevent price gouging by third-party suppliers.

7.     To safely obtain essential goods during the COVID-19 crisis, Plaintiffs Victoria Ballinger and Mary McQueen purchased items from Amazon at prices that far exceeded California's statutory threshold.  Amazon profited unlawfully from these sales, and Plaintiffs were harmed commensurately.  On behalf of themselves, and a Class of consumers similarly situated, Plaintiffs seek damages, restitution, injunctive relief, and all other available remedies.[3]

## II.     JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction because this is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), which confers original jurisdiction on the federal courts for any class action in which any member of the Class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate $5,000,000, exclusive of interest and costs.  Plaintiffs allege that the total claims of individual Class members in this action are in excess of $5,000,000, as required by 28 U.S.C. § 1332(d)(2) & (6).  Plaintiffs are citizens of California, whereas Defendant is a citizen of Washington, satisfying 28 U.S.C. § 1332(d)(2)(A).  Furthermore, more than two-thirds of all members of the proposed Class are citizens of California,

---

[2] *See* https://uspirgedfund.org/resources/usf/analysis-coronavirus-spike-most-surgical-mask-sanitizer-prices-least-50-amazon, last visited April 21, 2020.

[3] In bringing this action, Plaintiffs and their counsel are acutely aware of the severe hardship that COVID-19 has imposed on all segments of society, including all people who rely on Amazon to deliver vital goods and services.  Nevertheless, given the ongoing nature of the harm alleged herein, and to preserve all rights, Plaintiffs cannot delay this filing.  To minimize burden on the Court and to reasonably accommodate Amazon, Plaintiffs will make every reasonable scheduling accommodation, including with respect to Amazon's deadline to respond to this Complaint.

1    where this action is being filed, and the total number of Class members is greater than 100, as

2    required by 28 U.S.C. § 1332(d)(5)(B).  Federal subject matter jurisdiction thus exists.

3           9.     Defendant has minimum contacts with the United States, this judicial district, and

4    California, and has intentionally availed itself of the laws of the United States and California by

5    conducting a substantial amount of business throughout California, including in the sale of goods to

6    Plaintiffs and others residing in California.  This Court accordingly has personal jurisdiction over

7    Defendant

8           10.    Venue is appropriate in this District because a substantial part of the events giving rise

9    to Plaintiffs' claims occurred in this District.  *See* 28 U.S.C. § 1391(b)(2).  In particular, Plaintiff

10   Mary McQueen is a resident of Alameda County and purchased multiple products from Amazon

11   during the relevant period for her personal and home use.  As alleged herein, at least one of those

12   products was price-inflated by an unlawful amount following California declared states of

13   emergency, including an emergency declaration issued by Alameda County officials.

### III.    PARTIES

**A.    Plaintiffs**

16          11.    Plaintiff Mary McQueen resides in Oakland, California.  Ms. McQueen uses Amazon

17   to purchase essential consumer goods for herself and family, and she has relied on Amazon during

18   the COVID-19 crisis to obtain such items.

19          12.     On March 23, 2020, after a State of Emergency had been declared by Governor

20   Newsom and multiple local California officials, Ms. McQueen purchased a Sally Hansen Hair

21   Remover Kit from Amazon at a price of $6.74.  This consumer good was priced and supplied by

22   Amazon directly, not by a third-party supplier.

23          13.     Ms. McQueen purchased this personal hygiene product from Amazon because she

24   believed that, amidst the COVID-19 crisis, it could not be obtained (or obtained safely) from other

25   retail outlets, including brick-and-mortar stores in her vicinity.  In the circumstances, to obtain this

26   product, Ms. McQueen saw no meaningful choice but to purchase it from Amazon.

27          14.     Prior to declared states of emergency in California relating to the COVID-19 crisis,

28   Amazon's prevailing price for an Amazon-supplied Sally Hansen Hair Remover Kit was $4.75.

CLASS ACTION COMPLAINT - 4
Case No.:
010923-11/1258267 V1

1   Once states of emergency were declared, and just days after Governor Newsom's declaration, the

2   price of this product on Amazon began to spike, reaching $8.42 on March 17, 2020.  The specific

3   price Ms. McQueen paid for this product ($6.74) was 42% higher than the price at which Amazon

4   sold the same product prior to Governor Newsom's declaration ($4.75).[4]



15.     Plaintiff Victoria Ballinger resides in Selma, California.  Ms. Ballinger uses Amazon

to purchase essential consumer goods for herself and family, and she has relied on Amazon during

the COVID-19 crisis to obtain such items.

16.     On March 13, 2020, after a State of Emergency had been declared by Governor

Newsom and multiple local California officials, Ms. Ballinger purchased a facial cleanser from

Amazon—specifically, Mary Kay Time Wise 3-in-1 Facial Cleanser—at a price of $14.47.  While

sold by Amazon, this consumer good was supplied to Amazon by a third party.

17.     Ms. Ballinger purchased Mary Kay Time Wise 3-in-1 Facial Cleanser from Amazon

because she believed that, amidst the COVID-19 crisis, this consumer good could not be obtained (or

obtained safely) from other retail outlets, including brick-and-mortar stores in her vicinity.  In the

---

[4] *See* https://camelcamelcamel.com/product/B000AAAVZO, last visited April 21, 2020.

1   circumstances, to obtain this product, Ms. Ballinger saw no meaningful choice but to purchase it

2   from Amazon.

3   　　　　18.　　Prior to declared states of emergency in California relating to the COVID-19 crisis,

4   Amazon's prevailing price for third-party supplied Mary Kay Time Wise 3-in-1 Facial Cleanser was

5   $9.60.  Once states of emergency were declared, and just days after Governor Newsom's declaration,

6   the price of this product on Amazon began to spike, reaching $23.97 on or around April 10, 2020.

7   The specific price Ms. Ballinger paid for this product ($14.47) was 51% higher than the price at

8   which Amazon sold the same product prior to Governor Newsom's declaration ($9.60).[5]



**B.    Defendant**

19.    Defendant Amazon is the world's largest online retailer.  Amazon is a corporation

organized and existing under the laws of Delaware and with its principal place of business in Seattle,

Washington.

---

[5] *See* https://camelcamelcamel.com/product/B000OD4BBW, last visited April 21, 2020.

# IV.    FACTUAL ALLEGATIONS

## *Outbreak of Covid-19 and the Early Impact on California's Population*

20.    In late 2019, an outbreak of respiratory illness resulting from a novel coronavirus was first identified in Wuhan City, Hubei Province, China.  That illness, now known as COVID-19, has spread across the world.  COVID-19 has been designated a pandemic by the World Health Organization, the first pandemic resulting from a coronavirus.  As of the date of this Complaint, more than 2.43 million confirmed cases of COVID-19 have been reported across the globe, and more than 169,859 persons have died from their illness.[6]

21.    California was one of the first states affected by the pandemic and one of the first to see COVID-19 cases.  On January 17, 2020, travel to California was affected when the CDC began health screenings of passengers on direct or connecting flights from Wuhan to the "three U.S. airports that receive most of the travelers from Wuhan, China: San Francisco (SFO), New York (JFK), and Los Angeles (LAX) airports."[7]  The third confirmed COVID-19 case in the United States was an Orange County man diagnosed on January 26, 2020.  Shortly thereafter, the State Department evacuated 195 U.S. citizens and from Hubei Province, placing them in isolation at the March Air Reserve Base in Riverside, California.  Around the same time, new COVID-19 cases emerged in Santa Clara County in and around "Silicon Valley."  On January 31, the CDC confirmed that a Santa Clara man had tested positive for the virus, and an unrelated Santa Clara women tested positive two days later.  Around the same time, two additional cases were confirmed just south in San Benito County.  By February 12, 2020, eight of the nation's fourteen confirmed COVID-19 patients were in California, indicating that the virus was clustering in the state.[8]

22.    In the ensuing weeks, California facilities were used to quarantine nearly 700 U.S. nationals evacuated from Hubei Province and the Diamond Princess Cruise ship, which had been

---

[6] *See* https://ourworldindata.org/coronavirus, last visited April 21, 2020.

[7] *See* https://www.cdc.gov/media/releases/2020/p0117-coronavirus-screening.html, last visited April 21, 2020.

[8] *See* https://www.nytimes.com/2020/01/31/us/coronavirus-california.html?action=click&module=RelatedLinks&pgtype=Article, last visited April 21, 2020.

overrun by the virus.  More than a dozen of the evacuees tested positive for the virus, and many more were perilously exposed.

23.     Things took an even more dire turn on February 26, 2020, when health officials confirmed that a Solano County patient had tested positive for COVID-19 despite having no known exposure to the virus through travel or contact with an affected individual.  This was the first confirmation that COVID-19 was being transmitted in the United States through "community spread," suggesting that untold numbers of citizens were also affected but asymptomatic or otherwise not being tested for COVID-19.

24.     In their February warnings to citizens, California officials emphasized the increased risk of community spread due to the frequency of travel between China and localities in California. For example, on February 25, 2020, San Francisco issued a Press Release quoting Dr. Tomas Aragon, the San Francisco Health Officer, stating that there was a "growing likelihood" of COVID-19 cases in San Francisco "[g]iven the high volume of travel between San Francisco and mainland China."[9]  Indeed, given the substantial amount of travel between the state and China, medical experts warned early on that California was literally at the "front line" of the crisis.[10]

25.     While testing has remained limited, confirmed COVID-19 cases in California have increased exponentially since February, reaching 35,450 confirmed cases as of the date of this filing. At least 1,280 Californians have died from COVID-19.[11]

### *Emergency Declarations and "Shelter in Place" Orders*

26.     California officials were among the nation's first to take aggressive action to combat the spread of COVID-19.  Santa Clara County health officials declared a state of emergency on February 3, 2020, one week after Santa Clara County's first confirmed COVID-19 case.  Other

---

[9] *See* https://www.sfdph.org/dph/alerts/files/02.25.20_Public_Health_Update_Novel_Coronavirus.pdf, last visited April 21, 2020.

[10] *See* https://www.nytimes.com/2020/01/31/us/coronavirus-california.html?action=click&module=RelatedLinks&pgtype=Article, last visited April 21, 2020.

[11] *See* https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/, last visited April 21, 2020.

California cities and counties followed in rapid succession.[12]  On March 4, 2020, shortly after the first confirmed COVID-19 death in California, Governor Newsom proclaimed a State of Emergency pursuant to Government Code § 8625(c).  As of Governor Newsom's proclamation, 53 of the 129 confirmed COVID-19 cases in the United States were patients in California.[13]

27.     Once state of emergency orders had issued, local and state governments began to impose "shelter in place" orders requiring residents to remain home except for essential activities. On March 16, Governor Newsom instructed all Californians over 65 and anyone with a chronic medical condition, to engage in "self-isolation" to reduce the risk of COVID-19.[14]  To obtain necessary consumer goods, Governor Newsom directed all such individuals to "[c]onsider on-line ordering for food and other supplies."[15]  Governor Newsom expanded this directive to cover all Californians on March 19, 2020, instructing all "individuals living in the State of California to stay home or at their place of residence."[16]

28.     Local California governments issued similar and often more restrictive "stay-at-home" directives.  For example:

- **March 16, 2020**:  Santa Clara, San Francisco, Alameda, San Mateo, Contra Costa, and Marin counties, along with the City of Berkeley, instruct citizens to "self-isolate in their places of residence to the maximum extent feasible."[17] These orders covered the entire California Bay Area, with a population exceeding six million people.

---

[12] *See infra*, Part V, identifying the dates of state of emergency declarations by California officials in February and March 2020.

[13] *See* https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf, last visited April 21, 2020.

[14] *See* https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/Self_Isolation_Guidance_03.16.20.pdf, last visited April 21, 2020.

[15] *Id.*

[16] *See* https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf, last visited April 21, 2020.

[17] *See* https://www.sfdph.org/dph/alerts/files/HealthOrderC19-07-%20Shelter-in-Place.pdf]; http://www.acgov.org/documents/Final-Order-to-Shelter-In-Place.pdf; https://cchealth.org/coronavirus/pdf/HO-COVID19-SIP-0316-2020.pdf; https://www.marincounty.org/main/county-press-releases/press-releases/2020/hhs-covid-shelterinplace-031620; https://www.mercurynews.com/2020/03/16/coronavirus-read-shelter-in-place-order-from-six-bay-area-counties/, last visited April 21, 2020.

- **March 17, 2020**:  Monterey County, San Benito, and Sonoma issue shelter-in-place orders.[18]

- **March 19, 2020**:  Los Angeles issued its "shelter-in-place" order, requiring residents to "isolate themselves in their residences."[19]  Sacramento, Solano, Yolo, Yuba, and Sutter counties issue their own similar orders.[20]  These orders collectively applied to more than twelve million people.

- **March 24, 2020**:  Orange County directed its residents "not to leave the premises of their primary residence" except for basic needs and to practice "social distancing" when they do.[21]

29.    California's "shelter-in-place" orders generally require "social distancing," that is, that anyone exiting their home remain "six feet apart at all times."[22]  In issuing California's statewide "stay-at-home" order, Governor Newsom specifically instructed the entire state to "at all times practice social distancing."[23]

### ***Hoarding and Retail Scarcity***

30.    As COVID-19 spread through the United States, and government efforts to combat the virus intensified, consumers began to stockpile essential items.  By late January, prior to the first declared state of emergency declaration in California (Santa Clara's February 3 declaration), there were already reports that consumers were buying out retail stock of surgical masks and N95

---

[18] *See* https://www.thecalifornian.com/story/news/2020/03/17/monterey-county-health-officer-orders-shelter-place/5073496002/; https://hhsa.cosb.us/wp-content/uploads/2020/03/SAN-BENITO-COUNTY-ISSUES-PUBLIC-HEALTH-ORDERPR031720VF.pdf; http://sonomacounty.ca.gov/CAO/Press-Releases/Health-Officer-Orders-County-Residents-Shelter-in-Place/, last visited April 21, 2020.

[19] *See* https://www.lamayor.org/sites/g/files/wph446/f/page/file/SaferAtHomeAPR10.pdf, last visited April 21, 2020.

[20] *See* https://www.abc10.com/article/news/health/coronavirus/four-other-local-counties-are-also-order-residents-to-shelter-in-place/103-7e187abc-e6d2-4ed8-a4d0-7b3b7d2fc216, last visited April 21, 2020.

[21] *See* https://www.ocso.com/Portals/0/OC-Emergency-Executive-Order-2020-05-032620.pdf, last visited April 21, 2020.

[22] *See* https://www.sfdph.org/dph/alerts/files/StayHome-03272020.pdf, last visited April 21, 2020.

[23]  *See* https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf, last visited April 21, 2020.

respirators.[24]  The research firm Nielson found that the sale of medical supplies and rubbing alcohol surged nearly 20 percent after the first reported case of COVID-19 in the Unites States on January 30.[25]

31.     In February and March, the reports of stockpiling, scarcity, and hoarding escalated. Nielson found that sales of medical supplies and rubbing alcohol jumped 65 to 85 percent after there was a report of person-to-person transmission of COVID-19 on February 29.  The firm also found that powdered milk sales jumped 85 percent and rice and bean sales increased 25 to 37 percent.[26] For the week ending on March 7, 2020, compared to the same week a year earlier, sales of hand sanitizer, aerosol disinfectants, and multipurpose cleaners were 470, 385.3, and 148.2 percent higher, respectively.[27] Local news organizations in California frequently reported on scarcity and hoarding, and these reports only heightened consumer panic.  For example, on March 18, a local news station in the San Francisco Bay Area posted an article online, "Coronavirus impact: Why shoppers are hoarding toilet paper, supplies and groceries."[28]  The article discussed "one of the most visible reaction[s] to the coronavirus – empty shelves at the grocery stores," and interviewed a local shopper who had gone to a large grocery store hoping to buy paper towels and toiletries, but came away with nothing.[29]  The article's authors interviewed a local marketing professor, Michal Strahilevitz, to explain the hoarding and scarcity: "when something becomes scarce, everybody wants more of because they're afraid next time . . . [t]here won't be any toilet paper at all."[30]

---

[24]  *See* https://www.cnn.com/2020/01/28/health/coronavirus-us-masks-prevention-trnd/index.html, last visited April 21, 2020.

[25] *See* https://abc7news.com/hoarding-buying-frenzy-empty-grocery-shelves-toilet-paper-shortage/6025373/, last visited April 21, 2020.

[26] *Id.*

[27] *See* https://www.npr.org/2020/03/16/816404689/spiking-demand-for-sanitizer-canned-goods-leaves-stores-struggling-to-keep-up, last visited April 21, 2020.

[28] *See* https://abc7news.com/hoarding-buying-frenzy-empty-grocery-shelves-toilet-paper-shortage/6025373/, last visited April 21, 2020.

[29] *Id.*

[30] *Id.*

1     32.     Empty retail shelves were not an isolated phenomenon in California—they persisted

2     across the state.  By March 3, 2020, Costco stores throughout California began posting signs that

3     they were out of water, and there were reports of "shoppers mak[ing] a mad dash for Clorox wipes,

4     all while murmurs of the spread of the coronavirus rumble[d] through the crowds."[31]  Consumers

5     also stockpiled food items, with reports of "panic buying" cleaning out retail shelves across the

6     state.[32]  In the Bay Area, crowds lined up outside retail stores and "picked shelves clean of frozen

7     foods, meat, bread and toilet paper, as anxiety over coronavirus led many to stock up on supplies."[33]

8     This pattern was not limited to large retailers, as even "small neighborhood stores [were] getting

9     raided by coronavirus hoarders."[34]  Nor was hoarding limited to California's urban centers.  In

10    Chico, one shopper said this about her trip to Safeway:  "Toilet paper, gone.  Meat, gone.  Fruit and

11    vegetables, gone.  It's pretty bad in there."[35]

12    33.     By the middle of March, the California Grocers Association was pleading with

13    Californians to stop "hoarding and overbuying," as this was making it impossible to deliver

14    sufficient supplies to retail stores.[36]  To curtail buying, many retailers were forced to ration products

15    in high demand.[37]

16    ### *Consumers Turn Increasingly to Online Purchasing, And Amazon in Particular*

17    34.     In response to retail shortages and to limit exposure to the coronavirus, more

18    consumers have been doing their shopping online, increasing consumer demand and reliance on

19

20    [31] *See* https://www.nbclosangeles.com/news/costco-panic-buying-coronavirus/2321449/, last
      visited April 21, 2020.

21    [32] *See* https://abc7news.com/costco-coronavirus-bay-area-san-jose-panic-buying/6011289/, last
      visited April 21, 2020.

22    [33] *See* https://www.mercurynews.com/2020/03/14/coronavirus-shoppers-clear-grocery-store-
23    shelves-as-anxiety-ratchets-up/, last visited April 21, 2020.

      [34] *See* https://www.latimes.com/california/story/2020-03-14/even-liquor-stores-are-getting-
24    raided-by-people-hoarding-because-of-coronavirus, last visited April 21, 2020.

25    [35] *See* https://krcrtv.com/news/coronavirus/it-feels-like-black-friday-dozens-line-up-at-grocery-
      stores-to-stock-up-on-supplies, last visited April 21, 2020.

26    [36] *See* https://abc7news.com/coronavirus-us-what-is-news-the/6020212/, last visited April 21,
      2020.

27    [37] *See* https://sacramento.cbslocal.com/2020/03/16/grocery-hoarding-crackdown-coronavirus/,
28    last visited April 21, 2020.

online retailers.  According to a Nielson survey, in mid-March when the concerns over COVID-19

transmission rapidly escalated, approximately "one-quarter of shoppers said they expected to shop

online more frequently—or for the first time—to avoid germs in public places."[38]  The data confirm

that this has occurred.  The following graph shows a large increase in March sales of consumer

packaged goods ("CPG"), in store and online as compared to the same month a year ago, with an

astonishing 91 percent increase for online sales.  In the two weeks ending on March 21, upwards of

35 percent more people had shopped online for CPG items as compared with a typical week.[39]



35.     An unprecedented demand on internet retailers has also led to product scarcity online,

with some retailers out-of-stock and experiencing shipping problems, including large delays.[40]

---

[38] *See* https://www.nielsen.com/us/en/insights/article/2020/tracking-the-unprecedented-impact-of-covid-19-on-u-s-cpg-shopping-behavior/, last visited April 21, 2020.

[39] *See* https://www.nielsen.com/us/en/insights/article/2020/tracking-the-unprecedented-impact-of-covid-19-on-u-s-cpg-shopping-behavior/, last visited April 21, 2020.

[40] *See* https://www.digitalcommerce360.com/2020/03/20/a-viral-surge-how-the-coronavirus-is-impacting-shipping-and-delivery-of-online-orders/, last visited April 21, 2020.

Consumers thus have become only more reliant on Amazon—the world's largest online retailer—for essential consumer goods.  Indeed, Amazon's sales account for ***almost half of all U.S. retail e-commerce***.[41]  By comparison, Amazon's nine largest competitors have only a 1.1 to 6.6 percent share.[42]  In terms of product diversity, Amazon sells 12 million products on the Amazon.com platform, with a particularly large range of consumer goods.[43]  In 2018, it was estimated that Amazon had 1.5 billion items listed for sale and over 200 million users.[44]

36.     Industry observers have universally recognized that Amazon saw "unprecedented demand amid widespread coronavirus-related shutdowns."[45]  As one observer put it, with "millions of Americans ordered to remain home, Amazon is now, more than ever, a lifeline for essentials for millions of people rather than just a convenient option for online shopping."[46]  Amazon sales have skyrocketed.  By April 12, 2020, consumer spending on Amazon had increased 44 percent over the year prior.[47]  In a rapidly contracting economy, Amazon has hired more than 100,000 workers to address increased demand for its services, and is looking to hire 75,000 more.[48]

37.     One reason Amazon has seen its sales increase is that it can supply essential goods that are not always available on retail shelves in the COVID-19 era.  In addition, Amazon offers consumers the unique ability to purchase all range of consumer goods without venturing outside their homes—something health officials have warned brings risk of potentially fatal infection.  When

---

[41] *See* https://www.emarketer.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market, last visited April 21, 2020.

[42] *Id.*

[43] *See* https://0ca36445185fb449d582-f6ffa6baf5dd4144ff990b4132ba0c4d.ssl.cf1.rackcdn.com/IG_360piAmazon_9.13.16.pdf; Amazon store directory, https://www.amazon.com/gp/site-directory?ref_=nav_em_T1_0_2_2_36__fullstore, last visited April 21, 2020.

[44] *See* https://www.businessinsider.com/amazon-price-changes-2018-8, last visited April 21, 2020.

[45] *See* https://www.forbes.com/sites/sergeiklebnikov/2020/04/14/jeff-bezos-gets-63-billion-richer-as-amazon-stock-hits-a-new-record-high/#732cf86953b0, last visited April 21, 2020.

[46] *See* https://www.vox.com/recode/2020/4/10/21215953/amazon-fresh-walmart-grocery-delivery-coronavirus-retail-store-closures, last visited April 21, 2020.

[47] *See* https://first.facteus.com/, last visited April 21, 2020.

[48] *See* https://techcrunch.com/2020/04/13/amazon-to-hire-75000-more-to-address-increased-demand-due-to-coronavirus-crisis/, last visited April 21, 2020.

Governor Newsom instructed elderly and compromised Californians to isolate amidst the coronavirus, he specifically advised them to "[c]onsider on-line ordering for food and other supplies."[49]

38.     The CDC has likewise advised all Americans to "[o]rder food and other items online for home delivery or curbside pickup (if possible)," and to "[o]nly visit the grocery store, or other stores selling household essentials, in person when you absolutely need to," as "[t]his will limit your potential exposure to others and the virus that causes COVID-19."[50]  That concern is heightened for older adults and individuals with underlying health conditions, with the CDC advising that these Americans should consider "ways to get food, medicines, and essentials delivered to [their] home."[51] The CDC has also instructed individuals sick with COVID-19, or who believe they might have COVID-19, as follows: "Do not leave your home, except to get medical care. Do not visit public areas."[52]

39.     On March 4, 2020, Senator Edward J. Merkey (D-Massachusetts) wrote a letter to Amazon CEO Jeff Bezos about reports of price gouging on Amazon.[53]  He stated that "[i]nternet-based retailers such as Amazon.com have a particular responsibility to guard against price gouging in current circumstances as consumers—who are finding the shelves of local brick-and-mortar stores bare, and who may wish to avoid venturing into crowded stores and shopping malls—turn to the

---

[49] *See* https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/Self_Isolation_Guidance_03.16.20.pdf, last visited April 21, 2020.

[50] *See* https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/essential-goods-services.html. Notably, a March global survey of consumers, including those in the United States, found that 57 percent of consumers have altered their day-to-day activities to be as "contactless" as possible.  https://www.digitalcommerce360.com/2020/03/20/a-viral-surge-how-the-coronavirus-is-impacting-shipping-and-delivery-of-online-orders/, last visited April 21, 2020.

[51] *See* https://www.nfid.org/infectious-diseases/common-questions-and-answers-about-covid-19-for-older-adults-and-people-with-chronic-health-conditions/, last visited April 21, 2020.

[52] *See* https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html, last visited April 21, 2020.

[53] *See* https://www.markey.senate.gov/imo/media/doc/letter%20to%20Bezos%20re%20coronavirus%20price-gouging.pdf, last visited April 21, 2020.

internet."[54]  Consistent with Senator Merkey's observation, and heeding the official guidance

described above, consumers have turned to Amazon—the world's dominant online retailer—to

obtain the goods they require to survive and endure in these unprecedented times.

40.      Amazon's own policies further push online consumers to shop on its e-commerce

platform, Amazon.com.  For example, under its "fair pricing" provisions, Amazon penalizes third-

party suppliers who allow their products to be sold for lower prices outside Amazon.com.[55]

Amazon's "fair pricing" policy states that "Amazon regularly monitors the prices of items on our

marketplaces," and that if it sees "pricing practices" on the Amazon.com platform "that harm[]

customer trust, Amazon can remove the Buy Box [*i.e.*, the coveted one-click-to-buy button[56]],

remove the offer, suspend the ship option, or, in serious or repeated cases, suspend[] or terminat[e]

selling privileges."[57]  One of the pricing practices Amazon identifies as "harmful" to customer trust

is "[s]etting a price on a product or service that is significantly higher than recent prices offered *on or

off* Amazon."[58]

41.      Under the "fair pricing" provision, "[a]ny single product or multiple products

packages must have a price that is equal to or lower than the price of the same item being sold by the

seller on other sites or virtual marketplaces."[59]  The "fair pricing" provision "applies to both the

individual product price as well as the collective price that the item or items are being sold for."[60]

Amazon's "fair pricing" policy is in effect no different than its former explicit "price parity" (*i.e.*,

platform most favored nation or "PMFN") provision, and ensures that Amazon's prices are equal to

or better than prices on competing e-commerce sites.  With this policy in place, prices on Amazon

---

[54] *Id.*

[55] *See, e.g.*, https://www.inc.com/guadalupe-gonzalez/amazon-removes-price-parity-not-fair-price-rule-third-party-sellers-antitrust-violations.html, last visited April 21, 2020.

[56] *See infra*, ¶¶ 64, 66.

[57] *See* https://sellercentral.amazon.com/gp/help/external/G5TUVJKZHUVMN77V?language=en_US&ref=efph_G5TUVJKZHUVMN77V_cont_521, last visited April 21, 2020.

[58] *Id.* (emphasis added).

[59] *See* https://feedvisor.com/university/amazon-pricing-policy/, last visited April 21, 2020.

[60] *Id.*

are generally favorable to online alternatives, further driving customers to Amazon during the COVID-19 pandemic.

42. For all of the foregoing reasons, any "condition" Amazon purports to impose on its customers to compel arbitration of claims for price gouging during the COVID-19 pandemic is unconscionable, contrary to public policy, and otherwise unenforceable. The pandemic has fundamentally disrupted market conditions. Facing retail scarcity, "stay at home" orders and repeated warnings from government and public health officials that public interaction could result in fatal exposure, Plaintiffs and the Class they purport to represent had no meaningful choice but to purchase consumer and other goods from Amazon. That Class members purchased products from Amazon at unconscionably inflated prices, sometimes exceeding 600% (*see infra*), itself attests to the lack of meaningful options. Just as Amazon may not exploit consumers by inflating prices, *see infra*, Amazon cannot limit consumers' rights in the midst of the COVID-19 pandemic through adhesive conditions imposed on a "take it or leave it" basis.

### *Price Gouging Prohibitions Were Triggered by COVID-19 and Remain in Effect*

43. California law strictly prohibits price gouging during a declared emergency, including the COVID-19 crisis. In instituting this prohibition and explaining its policy grounds, California's legislature found that during a state of emergency "some merchants have taken unfair advantage of consumers by greatly increasing prices for essential consumer goods and services." Cal. Penal Code § 396(a). The legislature acknowledged that "[w]hile the pricing of consumer goods and services is generally best left to the marketplace under ordinary conditions, when a declared state of emergency or local emergency results in abnormal disruptions of the market, the public interest requires that excessive and unjustified increases in the prices of essential consumer goods and services be prohibited." *Id.*

44. To discourage price gouging, and make the prohibition effective and enforceable, California law fixes a 10 percent threshold for price increases during a declared emergency. Price increases above that are presumptively unlawful. This prohibition extends to all consumer goods, emergency supplies, and medical supplies, among other product categories. Specifically, the governing statute provides in pertinent part:

Upon the proclamation of a state of emergency declared by the President of the United States or the Governor, or upon the declaration of a local emergency by an official, board, or other governing body vested with authority to make that declaration in any county, city, or city and county, and for a period of 30 days following that proclamation or declaration, it is unlawful for a person, contractor, business, or other entity to sell or offer to sell any consumer food items or goods, goods or services used for emergency cleanup, emergency supplies, medical supplies, home heating oil, building materials, housing, transportation, freight, and storage services, or gasoline or other motor fuels for a price of more than 10 percent greater than the price charged by that person for those goods or services immediately prior to the proclamation or declaration of emergency.

Cal. Penal Code § 396(b).  Such prices increases are only permitted under California Penal Code § 396(b) if they are "directly attributable to additional costs" imposed on the seller by an upstream supplier or due to "additional costs for labor or materials used to provide the services [] during the state of emergency or local emergency."  *Id.*

45.     Any violation of California's price gouging law is a misdemeanor offense, punishable by imprisonment up to a year, or a fine of up to $10,000, or both.  *Id.* § 396(h).

46.     In addition, price gouging that violates California Penal Code § 396 is a per se "unlawful business practice and an act of unfair competition within the meaning of Section 17200 of the Business and Professions Code."  *Id.* § 396(i).

47.     The price protections set forth in California Penal Code § 396 were triggered no later than February 3, 2020, when Santa Clara County declared California's first state of emergency relating to COVID-19.  From that point forward, price increases anywhere in California exceeding the 10 percent statutory threshold were presumptively unlawful. Subsequent declarations of emergency by local, state and federal officials—which issued in rapid succession over the ensuing months[61]—reinforced this statewide prohibition.  Under the statutory scheme, a price increase of 10 percent after one of the subsequent declarations of emergency was unlawful even if it would have been lawful under a prior declaration (for example, because the price went down during the interim period).  *See id.* § 396(b).

---

[61] *See infra*, Part V.

CLASS ACTION COMPLAINT - 18
Case No.:
010923-11/1258267 V1

48.     Under California Penal Code § 396(b), the prohibition on price gouging endures thirty days from each declared state of emergency.  The prohibition can, however, be extended "for additional 30-day periods, as needed, by a local legislative body, local official, the Governor, or the Legislature, if deemed necessary to protect the lives, property, or welfare of the citizens."  *Id.* § 396(g).  By Executive Order N-44-20, dated April 3, 2020, Governor Newsom extended California's price gouging prohibition for all products covered by § 396(b) until September 4, 2020.[62]

### *Amazon Price Increases During the COVID-19 Pandemic Were Unlawful*

49.     As the world's largest online retailer, Amazon maintains its own inventory of products which it sells directly to consumers, including in California.  These Amazon-supplied products account for approximately 32 percent of the revenue from of all products sold on Amazon.[63]  In addition, Amazon sells products provided by third-party suppliers.  These third-party product sales account for approximately 68 percent of the sales revenue on the Amazon.com platform.[64]

50.     As the COVID-19 pandemic spread, Amazon's prices for many essential goods spiked dramatically, often by amounts that vastly exceeded the 10 percent threshold established under California law.  In his March 4, 2020 letter to Amazon CEO Jeff Bezos, Senator Merkey described "disturbing news reports of coronavirus-inspired price gouging on Amazon.com," including that bottles of Purell hand sanitizer, "typically sold for less than $10 per box," were "listed at $400," and similarly inflated prices existed for face masks.[65]  Senator Merkey explained that, as

---

[62] *See* https://www.gov.ca.gov/wp-content/uploads/2020/04/4.3.20-EO-N-44-20-text.pdf, last visited April 21, 2020. Executive Order N-44-20 further reinforces that sellers may not charge from April 4, 2020 until September 4, 2020, prices for protected goods that are higher "the highest price charged by that person or entity for that item on February 4 2020."  Technically, under the statute, the price protection extends back to February 3, 2020, because that is the date of the first operative state of emergency declaration in California.  The Executive Order does not purport to displace the statute in this respect.  *See* Executive Order N-44-20 (stating that provisions are "[i]n addition to the prohibitions set forth in Penal Code section 396").

[63] *See* https://www.emarketer.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market, last visited April 21, 2020.

[64] *Id.*

[65] *See* https://www.markey.senate.gov/imo/media/doc/letter%20to%20Bezos%20re%20coronavirus%20price-gouging.pdf, last visited April 21, 2020.

"first steps," Amazon had announced the prior week that it had removed listings for price gouging and reiterated that third-party suppliers must comply with Amazon's "fair pricing policies," but that there had been "continued reports of price gouging and a lack of transparency," which left consumers exposed to unfair trade practices.[66]  He referenced a third-party Amazon supplier whose goods were sold on Amazon and who described Amazon's enforcement policy as "haphazard."[67]

51.     On March 11, 2020, the United States Public Interest Research Group Education Fund ("PIRG") published a study showing that prices for half of certain public health products sold on Amazon—particularly, products in high demand during the COVID-19 crisis—had increased by more than 50 percent in February above their 90-day average.[68]  These price increases were not limited to products supplied by third parties.  Of the essential products PIRG evaluated, nearly one in six supplied by Amazon itself increased in price by more than 50 percent above the 90-day average.

52.     Referencing the PIRG study, Attorneys General from 33 states sent Amazon a letter on March 25, 2020, calling on Amazon to eliminate price gouging on its platform.  The Attorneys General, including California's, noted that "[a]s COVID-19 spreads throughout the country, it is especially important unscrupulous sellers do not take advantage of Americans by selling products at unconscionable prices."[69]  The letter implored Amazon to take action to abide by and enforce "the nation's consumer protection laws."[70]

53.     Other industry observers have analyzed Amazon's pricing data and concluded that Amazon "doubled its own prices on essential goods as the COVID-19 pandemic grew between early January and mid-March."[71]  At one point in March, observers noted, Amazon "listed a four-pack of

---

[66] Id.

[67] Id.

[68] See https://uspirgedfund.org/resources/usf/analysis-coronavirus-spike-most-surgical-mask-sanitizer-prices-least-50-amazon, last visited April 21, 2020.

[69] See https://www.attorneygeneral.gov/wp-content/uploads/2020/03/03_25_2020_Multistate-letter.pdf, last visited April 21, 2020.

[70] Id.

[71] See https://www.10news.com/news/coronavirus/data-shows-amazon-raised-prices-during-pandemic-alongside-sellers-accused-of-price-gouging, last visited April 21, 2020.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

its own brand of toilet paper for $72."[72]  Consumers confirmed these unconscionable prices, reposting the listings online hoping to warn others that Amazon itself was "participating in price gouging":[73]



54.    Although certain offending listings have been removed, Plaintiffs' independent investigation has confirmed that Amazon has sold products at unlawfully inflated amounts during the COVID-19 crisis, including before and after Amazon claimed to have cracked down on price gouging, and Amazon continues to do so.  Moreover, these price increases occurred both on products supplied by third parties and on products supplied by Amazon.  Unconscionable examples abound, starting with price increases Amazon imposed on its own inventory of products:

---

[72] *Id.*

[73] *See* https://www.reddit.com/r/mildlyinfuriating/comments/fiuwuo/amazon_themselves_participating_in_price_gouging/, last visited April 21, 2020.

1    • **Aleve Back & Muscle Pain Tablet, Pain Reliever**:  Increased *233 percent*, from $18.75 to

2    $62.40, immediately after declared states of emergency, and has remained at that price to

3    date.[74]



14   • **North 760008A Silicone Full Facepiece Respirators – Face Piece Only:** Increases of at

15   least *47 percent*, from less than $170 to $251.02, following declared states of emergency.[75]



---

[74] *See* https://camelcamelcamel.com/product/B07WDK2Z85?context=search, last visited April 21, 2020.

[75] *See* https://camelcamelcamel.com/product/B00142BRF0?context=search, last visited April 21, 2020.

- **Faraon Black Beans, 4 lb:** Increases up to *166 percent*, from $4.98 to $13.26, following declared states of emergency.[76]



- **Germ Guardian Plugable Air Purifier & Sanitizer:** Increases exceeding *45 percent*, from less than $35 to $50.99, following declared states of emergency.[77]



---

[76] *See* https://camelcamelcamel.com/product/B07BBW3N81?context=search, last visited April 21, 2020.

[77] *See* https://camelcamelcamel.com/product/B000G2BESO?context=search, last visited April 21, 2020.

- **Annie Chun's Cooked White Sticky Rice:** Increases of up to *119 percent*, from $7.96 to $17.40, following declared states of emergency.[78]



55.    Additional presumptively unlawful price increases on Amazon's own inventory of products following declared states of emergency include, but are not limited to, the following:

| OTHER PRICE INCREASES ON AMAZON INVENTORY DURING THE COVID-19 PANDEMIC | |
| --- | --- |
| **PRODUCT** | **PRICE INCREASE** |
| Clorox Hydrogen Peroxide Disinfecting Wipes | *200%*[79] |
| Campbell's Soup on the Go, Chicken & Mini Round Noodles | *151%*[80] |
| Hibiclens Antibacterial / Antiseptic Skin Cleanser | *~122%*[81] |
| Aleve Arthritis Cap Pain Relief | *117%*[82] |

---

[78] *See* https://camelcamelcamel.com/product/B000GPTC8U?context=search last visited April 21, 2020.

[79] *See* https://camelcamelcamel.com/product/B00K3U1B64?context=search, last visited April 21, 2020.

[80] *See* https://camelcamelcamel.com/product/B000MICPOY?context=search, last visited April 21, 2020.

[81] *See* https://camelcamelcamel.com/product/B00EV1D79A?context=search, last visited April 21, 2020.

[82] *See* https://camelcamelcamel.com/Aleve-Arthritis-Naproxen-Reliever-Headache/product/B07ZV5V19T, last visited April 21, 2020.

| | |
|---|---|
| Ice Mountain 199% Natural Spring Water | *37%*[83] |
| Medline Iodine Pads | *34%*[84] |
| Meyenberg Whole Powdered Goat Milk | *31%*[85] |
| Tide PODS Free and Gentle Laundry Detergent | *30%*[86] |
| Barbara's Puffins Original Cereal | *25%*[87] |
| 3M Full Facepiece Reusable Respirator 6700 | *~22%*[88] |
| KIND Bars, Dark Chocolate Nuts & Sea Salt | *36%*[89] |
| Immunityaid Support Blend | *19%*[90] |

56.     In addition to increasing prices on its own inventory during the COVID-19 pandemic, Amazon sold third-party supplied products at prices that vastly exceeded California's 10 percent statutory threshold and, by taking a share of the transaction proceeds, profited from the excess.  Just by way of example:

---

[83] *See* https://camelcamelcamel.com/Ice-Mountain-Natural-8-ounce-plastic/product/B01KCNJHYO?context=search, last visited April 21, 2020.

[84] *See* https://camelcamelcamel.com/product/B075KKP2BR?context=search, last visited April 21, 2020.

[85] *See* https://camelcamelcamel.com/product/B004K69OMU?context=search, last visited April 21, 2020.

[86] *See* https://camelcamelcamel.com/product/B07JMK7STT?context=search, last visited April 21, 2020.

[87] *See* https://camelcamelcamel.com/product/B00NTMVN0W?context=search, last visited April 21, 2020.

[88] *See* https://camelcamelcamel.com/product/B007JZ1K1C?context=search, last visited April 21, 2020.

[89] *See* https://camelcamelcamel.com/product/B07PMTGM3C?context=search, last visited April 21, 2020.

[90] *See* https://camelcamelcamel.com/product/B06XCRKTRR?context=search, last visited April 21, 2020.

1

2

- **Dynarex Corporation Surgical Procedure Masks**:  Increase of ***376 percent***, from $11.71 to $55.78, following declared states of emergency.[91]



- **Disposable Earloop Face Masks**:  Increases exceeding ***500 percent***, from less than $20 to $120, following declared states of emergency.[92]



---

[91] *See* https://camelcamelcamel.com/Dynarex-Corporation-2201-50-Surgical-Procedure/product/B00QO4MKN6?context=search, last visited April 21, 2020.

[92]*See* https://camelcamelcamel.com/product/B078718WVB?context=search, last visited April 21, 2020.

- **Cold-EEZE Cold Remedy Lozenges Honey Lemon:**  Increases up to *674 percent*, from $4.65 to $35.99, following declared states of emergency.[93]



- **Goya Black Beans Dry 14 oz:**  Increases up to *672 percent*, from $3.17 to $24.50, following declared states of emergency.[94]



---

[93] *See* https://camelcamelcamel.com/product/B000KOPX4O?context=search, last visited April 21, 2020.

[94] *See* https://camelcamelcamel.com/product/B00IMLRH9G?context=search, last visited April 21, 2020.

- **King Arthur Flour:** Increases up to ***400 percent***, from $22.00 to $110.00, following declared states of emergency.[95]



- **Healthful Home Disinfectant/Cleaner:** Increase of ***100 percent***, from $14.99 to $29.99, following declared states of emergency.[96]



---

[95]*See* https://camelcamelcamel.com/product/B078P9TBNW?context=search, last visited April 21, 2020.

[96] *See* https://camelcamelcamel.com/product/B00IGGVAEU?context=search, last visited April 21, 2020.

1

- **Signature's Dried Plums Pitted Prunes, 3.5 lbs:** Increases up to ***159 percent***, from $10.99

2

to $24.87, following declared states of emergency.[97]



57.     Additional presumptively unlawful price increases on third-party supplied Amazon

sales include, but are not limited to, the following:

| OTHER PRICE INCREASES ON THIRD-PARTY SUPPLIED PRODUCTS DURING THE COVID-19 PANDEMIC | |
| --- | --- |
| **PRODUCT** | **PRICE INCREASE** |
| StarKist Chunk Light Tuna in Water | ***417%***[98] |
| Barilla Pasta, Spaghetti | ***~349%***[99] |
| Kraft Macaroni & Cheese | ***315%***[100] |
| Almond Milk | ***229%***[101] |

---

[97] *See* https://camelcamelcamel.com/product/B0051JL6OY?context=search, last visited April 21, 2020.

[98] *See* https://camelcamelcamel.com/product/B00FWUO2IE?context=search, last visited April 21, 2020.

[99] *See* https://camelcamelcamel.com/product/B00WBGKJPW?context=search, last visited April 21, 2020.

[100] *See* https://camelcamelcamel.com/product/B011W21U0I?context=search, last visited April 21, 2020.

[101] *See* https://camelcamelcamel.com/product/B07HL1NRGQ?context=search, last visited April 21, 2020.

| | |
|---|---|
| Chef Boyardee, Spaghetti & Meatballs | *229%*[102] |
| Asian Best Jasmine Rice | *203%*[103] |
| Kirkland Signature Dried Cherries, 20 Ounce | *109%*[104] |
| Elder Berry Whole, dried 1lb | *108%*[105] |
| Better Than Bouillon Organic Chicken Base | *~87%*[106] |
| Kirkland Signature Ibuprofen Liquid Softgels | *81%*[107] |
| The Wild Mushroom Co. Dried Gourmet Mix | *~80%*[108] |
| Philippine Dried Mangoes | *61%*[109] |
| Raven Powder-Free Disposable Black Nitrile 6 Mi. Gloves | *~60%*[110] |
| Kirkland Almonds | *58%*[111] |
| Gerbs Super 5 Dried Fruit Mix | *47%*[112] |
| Kirkland Signature Fancy Mixed Nuts | *47%*[113] |
| Tea Tree oil Active Wipes | *43%*[114] |
| Immunity Boost Supplement with Elderberry | *32%*[115] |

[102] *See* https://camelcamelcamel.com/product/B004XVZG1U?context=search, last visited April 21, 2020.

[103] *See* https://camelcamelcamel.com/product/B019VPL9OK?context=search, last visited April 21, 2020.

[104] *See* https://camelcamelcamel.com/product/B004CSGRS0?context=search, last visited April 21, 2020.

[105] *See* https://camelcamelcamel.com/product/B076JMVSW5?context=search, last visited April 21, 2020.

[106] *See* https://camelcamelcamel.com/product/B00415IRQO?context=search, last visited April 21, 2020.

[107] *See* https://camelcamelcamel.com/product/B000VK2QPQ?context=search, last visited April 21, 2020.

[108]*See* https://camelcamelcamel.com/product/B075NVDRLY?context=search, last visited April 21, 2020.

[109] *See* https://camelcamelcamel.com/product/B000Q5NSAS?context=search, last visited April 21, 2020.

[110] *See* https://ca.camelcamelcamel.com/product/B002XXO5US?context=search, last visited April 21, 2020.

[111] *See* https://camelcamelcamel.com/product/B07913JFQK?context=search, last visited April 21, 2020.

[112]*See* https://camelcamelcamel.com/product/B00EQA93OY?context=search, last visited April 21, 2020.

[113] *See* https://camelcamelcamel.com/product/B077LZ2JQH?context=search, last visited April 21, 2020.

[114] *See* https://camelcamelcamel.com/product/B07RCG7NW5?context=search, last visited April 21, 2020.

[115] *See* https://camelcamelcamel.com/product/B081BCHH9V?context=search, last visited April 21, 2020.

| Anti-Viral Plus Topical Patches | *25%*[116] |
| Turboforte – Lung Expansion, Mucus Relief Device | *23%*[117] |

### *Amazon is Responsible for Unlawful Price Increases on All Products Sold on its Platform*

58.     Amazon is accountable for unlawfully increasing the prices on its own inventory of products during the COVID-19 crisis.  Amazon is also legally responsible for price gouging on the third-party products it sells.  Far from serving as passive intermediary, Amazon controls the sale of all third-party products on its platform and receives a portion of the transaction proceeds, typically around 15 percent of the sales price (in addition to assessing recurring fees on third-party suppliers).[118]

59.     For certain third-party products, Amazon retains complete control of pricing.  In particular, third-party suppliers who enroll in Amazon's "Sold by Amazon" ("SBA") program are guaranteed a "hands off the wheel selling experience," through which Amazon retains complete discretion to price and reprice third-party inventory however Amazon sees fit.  In the SBA program, the third-party supplier is guaranteed revenue from the sale of its product on Amazon.com based on the Minimum Gross Proceeds ("MGP") price, which Amazon sets unilaterally.  Moreover and critically, whatever the MGP price may be, *the price listed for and sold to the Amazon consumer* is set solely by Amazon, and may be more or less than the MGP price—it is up to Amazon.[119]

60.     Even for products that Amazon does not price, Amazon functions as the "seller" for all practical and legal purposes.  Consumers who purchase third-party products generally have no direct interaction with the third-party suppliers.  Amazon promotes the products on its website, the contents of which Amazon controls entirely.  Pursuant to the Amazon Services Business Solutions Agreement, which third-party suppliers are required to sign to have their products sold on

---

[116] *See* https://camelcamelcamel.com/product/B082VHQ7QP?context=search, last visited April 21, 2020.

[117] *See* https://camelcamelcamel.com/product/B07QMB7MFZ?context=search, last visited April 21, 2020.

[118] *See* https://www.junglescout.com/blog/amazon-fba-fees/, last visited April 21, 2020.

[119] *See* https://www.ecomcrew.com/the-amazon-sba-program-aka-sold-by-amazon/, last visited April 21, 2020.

Amazon.com, "Amazon has the right to determine, the design, content, functionality, availability and appropriateness of its websites, selection, and any product or listing in the Amazon Stores, and all aspects of each Service, including [a third-party supplier's] use of the same. Amazon may assign any of these rights or delegate any of its responsibilities."[120]  The Agreement also grants Amazon a royalty-free, non-exclusive, worldwide, right and license to commercially or non-commercially exploit in any manner, the information provided by third-party suppliers.[121]

61.    When a consumer purchases a third-party supplied product, Amazon collects the order, shipping, and payment information from the customer, and it processes all payments.  Amazon maintains the right to use mechanisms to rate, or allow shoppers to rate, these products and suppliers and to make the ratings publicly available, which it frequently does at the time the consumer is considering purchase.[122]

62.    Most third-party supplied products sold by Amazon are "Fulfilled by Amazon" or "FBA."  This means Amazon warehouses the products at its own storage facilities.  Amazon maintains electronic records tracking this inventory, which it can comingle with its own.[123]  When a customer orders an FBA product, Amazon packages and ships the product directly, while handling customer service aspects of the transaction.[124] Amazon handles returns and reserves the right to

---

[120] *See* https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US, at S-6, last visited April 21, 2020.

[121] *See* https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US, at 4, last visited April 21, 2020.

[122] *See* https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US&ref=efph_G1791_cont_1791, at S.1.2, last visited April 21, 2020.

[123] *See* https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US&ref=efph_G1791_cont_1791, at F-4, last visited April 21, 2020.

[124] *See* https://www.junglescout.com/amazon-seller-report/, last visited April 21, 2020; *see also generally* Amazon Services Business Solutions Agreement, Fulfillment By Amazon Service Terms.

fulfill customer returns with *any* "returned Amazon Fulfillment Units."[125]  Amazon unilaterally determines which products may participate in the FBA program.[126]

63.     Amazon also reserves "sole discretion" to "cancel[]" listings of third-party suppliers' products or "remov[e]" suppliers' listing privileges for violation of Amazon policies,[127] to permanently "withhold any payments" to suppliers for engaging in, *inter alia*, "illegal activity" or repeated violations of Amazon's "Program policies,"[128] and to "accept, calculate, and process cancellations, returns, refunds, and adjustments for the benefit of customers."[129] Amazon prohibits third-party suppliers from sending unsolicited communications to customers, mandates that all communications must be sent through a service provided on the Amazon platform, and Amazon keeps a record of all correspondence using this service.[130]

64.     Amazon promotes the sales of products listed on its platform, including those provided by third parties, and as described above, greatly profits from these sales.  One example of Amazon's product promotion is the "Buy Box," a white box on the right side of the product details page where shoppers can click "Add to Cart" or "Buy Now."  This is a critical listing for a supplier's

---

[125] *See* https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US&ref=efph_G1791_cont_1791, at F-6.2, last visited April 21, 2020.

[126] *See* https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US&ref=efph_G1791_cont_1791, at F-1, last visited April 21, 2020.

[127] *See* https://sellercentral.amazon.com/gp/help/external/200832300?language=en-US&ref=mpbc_200832290_cont_200832300, last visited April 21, 2020.

[128] *See* https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US, at 2, last visited April 21, 2020.

[129] *See* https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US, at S-2.2, last visited April 21, 2020.

[130] *See* https://sellercentral.amazon.com/gp/help/external/help.html?itemID=G1801&language=en_US&ref=ag_G1801_cont_521; https://sellercentral.amazon.com/gp/help/external/help.html?itemID=202125900&language=en_US&ref=efph_202125900_relt_TV8NTY5RM6N9LUN, last visited April 21, 2020.  Amazon also requires that its third-party suppliers release it and agree to indemnify, defend, and hold it harmless against any claim, loss, damage, settlement, cost, expense, or other liability arising from, *inter alia*, sales of the suppliers' products. *See* https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US, at 6.1, last visited April 21, 2020.

products.  Over 80 percent of Amazon purchases made on desktops are initiated via the Buy Box, and due to the smaller screen size, an even higher percentage of mobile Amazon purchases are made through the Buy Box option.[131]  When users click the "Add to Cart" or "Buy Now" button on the Amazon.com platform, they are buying the Buy Box winner.[132]  Amazon profits from each sale, including by means of sales' commissions, which Amazon calls "Referral Fees."  Over 90% of sales occur using the Buy Box.[133]

65.     For all of the foregoing reasons, even in the instances where Amazon has allowed third-party suppliers to price their own products, Amazon facilitates and controls all fundamental aspects of the sale.  As the functional seller of these third-party products, Amazon is responsible when it sells them at prices that exceed legal prohibitions on price gouging.

66.     Moreover, and for similar reasons, Amazon has (a) furnished the means for the sales of products supplied by third parties at unlawfully inflated prices, and (b) aided-and-abetted the third-party suppliers through active participation in their violations, all while profiting off of the price-inflated sales.  As explained, Amazon retains complete control over the content of its sales platform, Amazon.com, by contract.  It maintains significant control over interactions with customers and the processing of payments, and particularly with regard to those products "Fulfilled by Amazon," handles product distribution.  Amazon approves the third-party suppliers whose products are permitted to be sold on Amazon.com, and Amazon reserves the right to remove these third parties and any listing for violation of Amazon's policies, which Amazon holds out as, *inter alia*, prohibiting price gouging.  Amazon promotes the sales of products listed on its platform as described above, and facilitates the sales of products listed on the Amazon.com platform (products supplied by third parties and those supplied by Amazon), including by selecting eligibility for the Buy Box and identifying the Buy Box winner, based on a complex Amazon algorithm that takes into account,

---

[131] *See* https://www.wordstream.com/blog/ws/2018/10/03/amazon-buy-box, last visited April 21, 2020.

[132] *See* https://tinuiti.com/blog/amazon/win-amazon-buy-box/, last visited April 21, 2020.

[133] *Id.*

among other things, price, fulfillment, and the suppliers' rating.[134]  Amazon has shoppers rate products and suppliers, maintains control over the data, and frequently makes the ratings available to consumers at the time they are contemplating purchase.  Moreover, as explained *infra*, Amazon knew that third-party suppliers were engaging in price gouging on its platform.  Nothing is sold on Amazon, at any price, without Amazon's essential and active participation.

67.     Even if Amazon were not the seller of certain third-party products, Amazon has a legal duty to prevent foreseeable harm arising from the use of its platform, including by third-party suppliers.  Where Amazon had delegated pricing authority to third parties, Amazon has an obligation to ensure that products are not being offered for sale on its platform at legally excessive prices.

68.     It was utterly foreseeable that some of Amazon's third-party suppliers would excessively inflate prices during the COVID-19 crisis, including in California.  Amazon's third-party suppliers have previously inflated prices to unlawfully capitalize on emergencies, most prominently during Hurricane Irma in 2017.[135]  Moreover, wherever COVID-19 has spread, it has led to scarcity of essential consumer items and substantial price inflation.  Amazon was on notice that the same dynamic would play out in California once the virus reached its shores, or even sooner.

69.     Price inflation on third-party supplied products was not only foreseeable, Amazon *knew* that it was occurring in real time and has claimed to have longstanding rules and systems to prevent and stop price gouging as a violation of its "fair pricing" policies (those claims, as shown in this Complaint, have been proven false).  Amazon assiduously tracks pricing on its platform to best position itself in the marketplace.  Amazon thus knew that California prices on third-party priced products were exceeding legal thresholds, often by unconscionable amounts, after California's first declared state of emergency on February 3, 2020.  Amazon had an obligation to prevent this price gouging from occurring, and to stop it once it occurred, which Amazon could readily do by excising

---

[134] *See* https://tinuiti.com/blog/amazon/win-amazon-buy-box/, last visited April 21, 2020.

[135] *See* https://money.com/amazon-bottled-water-price-gouging-hurricane-irma-florida/, last visited April 21, 2020.

1   offending third-party suppliers and taking down excessively priced listings.  Amazon retains

2   contractual authority to take these very steps.[136]

3         70.     Amazon did not act, however, until late February, when it first began to suspend and

4   take down some (but not close to all) products priced excessively by third parties.[137]  Moreover,

5   while Amazon's actions made for good publicity, they did not effectively address—much less

6   eliminate—the problem.  Amazon continued to sell third-party priced products at unconscionably

7   inflated prices, as the examples cited in this Complaint demonstrate.  Notably in this regard, after

8   Amazon took its limited initial steps to address price gouging by third-party suppliers, Senator

9   Markey commented on Amazon's claim that it was addressing price gouging, writing on March 4,

10  2020 that despite Amazon's purported efforts, there had been "continued reports of price gouging"

11  on the platform.[138]

12        71.     As public outcry swelled, Amazon was compelled on March 23, 2020 to suspend

13  3,900 United States accounts associated with products Amazon offered at excessive prices.[139]  On

14  that same date, Amazon issued a blog post stating that it has "zero tolerance for price gouging" and

15  claimed to have had "longstanding policies and systems to prevent this harmful practice."[140]  But

16

17  ──────────────

[136] *See*
https://sellercentral.amazon.com/gp/help/external/G5TUVJKZHUVMN77V?language=en_US&amp;amp;ref=efph_G5TUVJKZHUVMN77V_cont_521, last visited April 21, 2020.

18
19  [137] *See* https://www.cnbc.com/2020/02/27/amazon-cracks-down-on-coronavirus-price-gouging-false-claims.html, last visited April 21, 2020.

20  [138] *See*
https://www.markey.senate.gov/imo/media/doc/letter%20to%20Bezos%20re%20coronavirus%20price-gouging.pdf, last visited April 21, 2020.

21
22  [139] *See* https://www.usatoday.com/story/money/2020/03/23/coronavirus-amazon-price-gouging-removed-accounts/2904729001/, last visited April 21, 2020.  In a letter to shareholders published on April 16, 2020, Amazon CEO Jeff Bezos indicated that Amazon had suspended "more than 6,000 selling accounts globally."
https://www.sec.gov/Archives/edgar/data/1018724/000119312520108427/d902615dex991.htm, last visited April 21, 2020.  The letter did not specify how many of these accounts were operating in the United States, or whether that number is any greater than the 3,900 United States accounts suspended previously.

23
24
25
26  [140] *See* https://blog.aboutamazon.com/company-news/price-gouging-has-no-place-in-our-stores, last visited April 21, 2020 (notably claiming to make clear to all of its sellers that it has policies to ensure "fair pricing," but providing no further specifics, including about the particular prohibitions under California Penal Code § 396).  The Amazon Marketplace Fair Pricing Policy reflects this vagueness and provides no clear directions to third-party suppliers about the specific price increases that would, for example, violate California law. *See*

27
28

those assertions already had been proven false with the gouging ramping up and ongoing for months. And Amazon's actions even at that point, were again inadequate.  Just two days later, 33 Attorneys General, including California's Attorney General Xavier Becerra, advised Amazon the "new protections" implemented by Amazon had "failed to remove unconscionably priced critical supplies during the COVID-19 pandemic."[141]  To this day, third parties are pricing critical goods on the Amazon platform at unconscionable levels, and Amazon is selling those goods to consumers, including in California.

72.     Exercising reasonable care, Amazon should have had adequate systems in place long before COVID-19 reached California to monitor and eliminate price gouging on its platform.  As 33 Attorneys General have advised, Amazon should not simply react to third-party price inflation—it should have policies to "prevent unconscionable price increases from occurring in the first place."[142]

73.     Ultimately, the most troubling aspect of Amazon's "efforts" to address third-party price gouging is not that they came late, or were ineffectual, or that Amazon profited on these sales, all of which is true; it is that while Amazon actively publicized these efforts, Amazon itself continued to sell its own inventory of products at prices that vastly exceed California's threshold for illicit price gouging.

### *Amazon Has Price-Gouged Its Way to Unprecedented Revenues During the COVID-19 Crisis*

74.     With rampant price gouging, Amazon has exploited unprecedented consumer demand during the COVID-19 to reap extraordinary profits.  While Amazon has yet to announce its quarterly earnings, analysts predict that the company's 2020 first-quarter revenues will reach $73 billion, up approximately *22%* over the first quarter of 2019.[143]  This means that Amazon has generated $10,000 every second of every day in 2020.

---

https://sellercentral.amazon.com/gp/help/external/G5TUVJKZHUVMN77V, last visited April 21, 2020.

[141] *See* https://www.attorneygeneral.gov/wp-content/uploads/2020/03/03_25_2020_Multistate-letter.pdf, last visited April 21, 2020.

[142] *See* https://www.attorneygeneral.gov/wp-content/uploads/2020/03/03_25_2020_Multistate-letter.pdf, last visited April 21, 2020.

[143] *See* https://www.theguardian.com/technology/2020/apr/18/amazon-quarterly-results-10000-dollars-a-second, last visited April 21, 2020.

75.     Despite the stock market's collapse in 2020, there has never been a better to time to be an Amazon shareholder.  As one leading analyst put it:

> [Amazon] has achieved a feat that many investors on Wall Street would regard as impossible in a stock market that's fallen sharply off its highs this year. Amazon's shares have soared more than 40% in the past month alone to a new record high as of early afternoon trading on Thursday, giving the company a market value of more than $1.2 trillion.[144]

76.     Jeff Bezos, Amazon's president and CEO, has seen his personal fortune swell during the COVID-19 pandemic.  Among other assets, Mr. Bezos owns an 11.2 percent stake in Amazon.  On April 14 alone, when Amazon stock surged more than 5 percent, Mr. Bezos's fortune grew by some $6.3 billion.  Amazon's surge throughout 2020 has added nearly $24 billion to Mr. Bezos's overall net worth.[145]

## V.     CLASS ACTON ALLEGATIONS

77.     Plaintiffs bring this proposed action on behalf of themselves and, pursuant to Rules 23(a), 23(b)(2) & 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (collectively, the "Class"):

> All persons who purchased in California any Protected Product on Amazon.com on or after February 4, 2020 at a price 10 percent greater than the price charged on Amazon.com for the same Protected Product (a) on February 2, 2020, or (b) immediately prior to any declaration of a State of Emergency relating to the COVID-19 crisis.

6.     The following definition apply to the Class definition:

- "**State of Emergency**" means any emergency relating to COVID-19 or the novel coronavirus declared by (a) the President of the United States, (b) the Governor of California, or (c) any official, board, or other governing body vested with authority to make that declaration in any county, city, or city and county in California.  States of Emergency were declared on at least the following dates:

   o   February 3, 2020:  Santa Clara County

---

[144] *See* https://www.investopedia.com/amazon-earnings-4692665, last visited April 21, 2020.

[145] *See* https://www.salon.com/2020/04/16/jeff-bezos-worlds-richest-man-post-24-billion-in-personal-profit-due-to-amazons-pandemic-surge_partner/, last visited April 21, 2020.

- February 14, 2020: San Diego County
- February 25, 2020: San Francisco (Mayor's Declaration)
- February 26, 2020: Orange County
- February 27, 2020:  Solano County
- March 1, 2020: Alameda County
- March 2, 2020: Sonoma County
- March 3, 2020: Placer County; Mariposa County; Marin County
- March 4, 2020: California, Governor Newsom; Los Angeles County; Mendocino County; Nevada County; Santa Cruz County
- March 5, 2020: Sacramento County; Imperial County
- March 6, 2020:  City and County of San Francisco; Butte County; Yolo County; San Benito County; Monterey County
- March 8, 2020: Riverside County
- March 9, 2020:  Lake County
- March 10, 2020:  Contra Costa; Calaveras County; Sutter; Yuba; San Bernardino County
- March 11, 2020:  Humboldt County; Stanislaus County
- March 12, 2020:  El Dorado County; Amador County; Napa County; Santa Barbara County; Ventura County; San Joaquin County
- March 13, 2020:  United States, President Trump; Merced County; Modoc County; San Luis Obispo County
- March 15, 2020:  Fresno County; Mono County
- March 16, 2020:  Kern County; Inyo County; Madera County; Plumas County
- March 17, 2020:  Kings County; Shasta County; Siskiyou County; Tehama County; Tuolumne County
- March 18, 2020:  Colusa County
- March 19, 2020: Alpine County
- March 20, 2020:  Lassen County; Sierra County

1

           o   March 24, 2020:  Del Norte

2

       •  "**Protected Product**" means all consumer food items or goods, goods or services

3

          used for emergency cleanup, emergency supplies, medical supplies, home heating oil,

4

          building materials, housing, transportation, freight, and storage services, or gasoline

5

          or other motor fuels. *See* Cal. Penal Code § 396(b).[146]

6

      78.    Plaintiffs reserve the right to revisit the Class definition based upon information

7

learned through discovery.

8

      79.    Excluded from this proposed Class are Defendant; Defendant's affiliates and

9

subsidiaries; Defendant's current or former employees, officers, directors, agents, and

10

representatives; and the district judge or magistrate judge to whom this case is assigned, as well as

11

those judges' immediate family members.

12

      80.    This action may appropriately proceed as a class action because Plaintiffs seek

13

injunctive relief that will apply to the Class as a whole and, further, because Plaintiffs will prove the

14

elements of their damages claims with predominantly common evidence.

15

      81.    **Numerosity:**  The proposed Class includes thousands (and potentially millions) of

16

consumers who paid unlawfully inflated prices for products on Amazon.com.  The members of this

17

Class are so numerous that individual joinder of all Class members is impracticable.  The precise

18

number of Class members is not available to Plaintiffs at this time, but the number and identity of

19

individual Class members can be ascertained from Amazon's books and records.

20

      82.    **Commonality and Predominance:**  Numerous questions of law and fact are common

21

to the claims of the Plaintiffs and members of the proposed Class, and these common questions

22

predominate over any questions affecting only individual Class members.  These include, but are not

23

limited to:

24

        (a)    Whether Amazon inflated prices in California during the COVID-19

25

pandemic;

26

27

    [146] This definition incorporates all defined terms in California Penal Code § 396(j), including but not limited to those for "building materials," "consumer food items," emergency supplies," "gasoline," and "goods."

28

CLASS ACTION COMPLAINT - 40
Case No.:
010923-11/1258267 V1

(b)     Whether those price increases were in excess of 10 percent on products protected under California Penal Code § 396;

(c)     Whether Amazon's price increases occurred after qualifying declared states of emergency in California under California Penal Code § 396;

(d)     Whether Amazon unlawfully increased prices on its own inventory of products;

(e)     Whether Amazon is liable for price increases on products supplied by third-parties;

(f)     Whether Amazon exercised reasonable care to monitor and prevent price inflation by third-party Amazon suppliers;

(g)     Whether and the extent to which consumers in California were harmed by unlawful price increases on Amazon;

(h)     The extent to which Amazon was enriched unjustly;

(i)     Whether Amazon should be subjected to punitive damages, and the appropriate amount; and

(j)     Whether Plaintiffs are entitled to injunctive relief and the appropriate scope of any equitable decree.

83.     **Typicality:** Plaintiffs' claims are typical of the claims of all Class members because, among other things, all Class members were comparably and similarly injured by Amazon's wrongful conduct alleged herein. Plaintiffs, like all Class members, purchased products from Amazon at prices that were unlawfully inflated during the COVID-19 pandemic.

79     **Adequacy**: Plaintiffs will represent and protect the interests of the proposed Class adequately and fairly. Plaintiffs have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Class, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

84.     **Injunctive and declaratory relief:** By way of the conduct described in this Complaint, defendant has acted on grounds that apply generally to the proposed Class. Accordingly,

1    final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a

2    whole.

3         85.    **Superiority:**  A class action is superior to all other available methods for the fair and

4    efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in

5    its management.  Even if members of the proposed Class could sustain individual litigation, that

6    course would not be preferable to a class action because individual litigation would increase the

7    delay and expense to the parties due to the complex factual and legal controversies present in this

8    matter.  Here, the class action device will present far fewer management difficulties, and it will

9    provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by

10   this Court.  Further, uniformity of decisions will be ensured.

## VI.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200)

14        86.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

15        87.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et*

16   *seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act

17   or practice."

18        88.    Any violation of California Penal Code § 396 "constitute[s] an unlawful business

19   practice and an act of unfair competition within the meaning of Section 17200 of the Business and

20   Professions Code."  Cal. Penal Code § 396(i).

21        74.    As set forth herein, Amazon violated California Penal Code § 396(b) because, after

22   states of emergency were declared in California in relation to COVID-19, Amazon sold and offered

23   to sell Protected Products at prices "10 percent greater" than the price Amazon charged "immediately

24   prior to the proclamation or declaration of emergency."  Cal. Penal Code § 396(b).  The Protected

25   Products Amazon sold or offered to sell at statutorily excessive prices include "consumer food items

26   or goods, goods or services used for emergency cleanup, emergency supplies, medical supplies,

27   home heating oil, building materials, housing, transportation, freight, and storage services, or

28   gasoline or other motor fuels."  *Id.*

CLASS ACTION COMPLAINT - 42
Case No.:
010923-11/1258267 V1

89.     On information and belief, Amazon's price increases were not directly attributable to additional costs imposed on Amazon by the suppliers of the Protected Products, and Amazon increased prices on many Protected Products in excess of 10 percent even when accounting for any additional costs and the markup Amazon customarily applies to the Protected Products. *See id.* § 396(b).

90.     All products available on Amazon.com are sold or offered for sale by Amazon, and thus Amazon is liable under California Penal Code § 396(b), and the UCL, for all unlawful price on its platform.  This includes sales involving Amazon's own inventory of products.  It also includes sales involving products supplied by third parties.  Consumers purchasing third-party supplied products interact almost exclusively with Amazon, which, functioning as the seller for the purposes of § 396(b), controls virtually all aspects of the transaction including, in some cases, the price itself.  Even with respect to products priced by third-party suppliers, Amazon functions as the seller for purposes of § 396(b), because it is the entity that offers the products for sale and controls the transaction.

91.     In the alternative, or in addition, Amazon is liable under the UCL for products priced by third parties because Amazon (a) furnished the means for the violation of § 396(b) and (b) aided and abetted the third-party suppliers through active participation in their wrongdoing.

92.     As a direct and proximate result of Amazon's unlawful and unfair business acts and practices, Plaintiffs have suffered and will continue to suffer actual damages.  Plaintiffs are entitled to injunctive relief and Amazon should be required to make full restitution to Plaintiffs and disgorge its unjust profits made as a result of such unlawful and unfair business acts and practices described above.

## SECOND CAUSE OF ACTION
### NEGLIGENCE AND NEGLIGENCE PER SE

93.     Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

94.     Amazon has a non-delegable duty to apply a level of care commensurate with the foreseeable harms arising from its control, maintenance, and management of the largest online retail platform in the world.  This encompasses a duty to ensure that, during a declared public emergency,

CLASS ACTION COMPLAINT - 43
Case No.:
010923-11/1258267 V1

consumer products, medical supplies, emergency products and other Protected Products are not sold on the platform at excessive prices.

95.     As the COVID-19 crisis emerged in California in January 2020, and even prior, it was foreseeable that third-party suppliers on Amazon would inflate prices excessively for many goods essential to enduring and combatting the public health crisis.  Such price inflation has occurred on Amazon's platform in prior emergencies, and was occurring wherever COVID-19 spread.  In proscribing price gouging, California's legislature specifically acknowledged its foreseeability, noting that during states of emergency, "merchants have taken unfair advantage of consumers by greatly increasing prices for essential consumer goods and services."  Cal. Penal Code § 396(a).

96.     Amazon's duty to prevent price gouging in California during the COVID-19 pandemic is reinforced by California Penal Code § 396(b), which provides that, upon the declaration of a state of emergency by the president, governor, or local official, any price increase exceeding 10 percent on consumer goods, emergency supplies, medical supplies, and other products is presumptively unlawful.

97.     Amazon has the ability, technological capacity, and contractual right to prevent price gouging during a declared emergency.  Amazon maintains complete control over its platform. It has oversight on the prices of all products sold on the platform and, by contract with its third-party suppliers, may unilaterally remove or suspend any listing priced excessively.

98.     Amazon, its agents, servants, and/or employees, failed to exercise ordinary care and failed to comply with existing standards of care in the following acts and/or omissions:

- Failing to maintain systems to detect price increases by third-party suppliers in excess of California's statutory threshold;

- Failing to remove (or timely remove) product listings priced above California's statutory threshold by third-party suppliers;

- Failing to remove from the Amazon platform (or timely remove) third-party suppliers engaged in unlawful price gouging;

- Failing to adequately investigate reports of excessive price inflation on third-party supplied products;

- Delegating pricing authority to third-party suppliers while failing to adequately inform them of California legal threshold for price increases during declared states of emergency.

99.     Given the foreseeability of price gouging during the COVID-19 pandemic, a reasonable online retailer in Amazon's position would have had systems in place to prevent price gouging from ever occurring, and would have taken prompt aggressive steps to stamp it out entirely. Amazon did not do so.  Despite Amazon's vast resources and sophistication, it lacked or failed to implement systems to prevent unlawful price increases on third-party supplied products, and the acts Amazon ultimately did take to address price gouging came far too late, and were ineffectual.

100.    Amazon knew that, because of its failure to exercise reasonable care, consumers such as Plaintiffs would be overcharged.

101.    Amazon's actions and omissions resulted in thousands, if not millions, of violations of California's price gouging statute.  *See* Cal. Penal Code § 396(b).  This law was designed to protect Plaintiffs and similarly situated persons from the economic injuries they have suffered.  Accordingly, Amazon's conduct constitutes negligence per se.

102.    Amazon's negligence was the proximate cause and substantial factor in causing Plaintiffs' economic loss.  Had Amazon exercised reasonable care, Plaintiffs would not have paid excessive amounts for products they purchased from Amazon.  Plaintiffs are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT

103.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

104.    Amazon has exploited vulnerable consumers by selling, and offering for sale, products at excessive prices during COVID-19 pandemic.  Facing retail scarcity, and official warnings as to the risks of public interaction, consumers have turned to Amazon as a lifeline to obtain goods vital to their safety, health, and well-being.  California law, and basic principles of equity and fair dealing, prohibit sellers from capitalizing on such exigencies to charge consumers excessive prices.

105.    By selling consumer goods, emergency supplies, medical equipment and other essential products in California at excessive and inflated prices during the COVID-19 pandemic, Amazon was unjustly enriched.  Amazon profited on both the sale of its own inventory as well as products supplied by third-parties, for which Amazon retains a portion of the transaction proceeds. All of these inflated profits were conferred by California consumers, and retained unjustly by Amazon.

106.    In selling goods at excessive prices during a public health crisis, Amazon knew that it was overcharging consumers, that consumers would be harmed, and that by retaining the sale proceeds Amazon would be unjustly enriched.

107.    In the event Plaintiffs lack an adequate remedy at law, Amazon is required to make restitution in equity pursuant to the common law of unjust enrichment.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief on their own behalf and on behalf of all those similarly situated:

A.    That the Court certify the proposed Class and appoint Plaintiffs as Class representatives and their counsel as Class counsel;

B.    That the Court award them and the proposed Class all appropriate relief, to include, but not be limited to damages, restitution, and public injunctive relief prohibiting Amazon from forever engaging in the wrongful conduct alleged herein, which has harmed Plaintiffs, the Class, and the public at large;

C.    That the Court grant such additional orders or judgments as may be necessary to remedy or prevent the unlawful practices complained of herein;

D.    That the Court award them and the proposed Class reasonable attorneys' fees, costs, and pre- and post-judgment interest;

E.    That the Court impose punitive damages; and

F.    That the Court award them and proposed Class such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

1

**JURY TRIAL DEMANDED**

2

Plaintiffs demand a trial by jury on all issues so triable.

3

Dated: April 21, 2020                    Respectfully submitted,

4

HAGENS BERMAN SOBOL SHAPIRO LLP

5

By */s/ Ben Harrington*

6

Ben Harrington (313877)
Benjamin J. Siegel (256260)

7

HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202

8

Berkeley, California  94710
Telephone:  (510) 725-3000

9

Facsimile:  (510) 725-3001
Email: benh@hbsslaw.com

10

Email: bens@hbsslaw.com

11

Steve W. Berman (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP

12

1301 Second Avenue, Suite 2000
Seattle, Washington  98101

13

Telephone: (206) 623-7292
Facsimile: (206) 623-0594

14

Email: steve@hbsslaw.com

15

*Attorneys for Plaintiffs and the Proposed Class*

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT - 47
Case No.:
010923-11/1258267 V1