Steve W. Berman (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

Ben M. Harrington (313877)
Benjamin J. Siegel (256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: benh@hbsslaw.com
Email: bens@hbsslaw.com

*Attorneys for Plaintiffs and
the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ALVIN GREENBERG, MICHAEL STEINBERG, and JULIE HANSON, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>  v.<br><br>AMAZON.COM, INC., a Delaware corporation,<br><br>       Defendant. | Case No. 4:20-cv-02782-JSW<br><br>FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, UNJUST ENRICHMENT, AND NEGLIGENCE<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................1

II.   JURISDICTION AND VENUE ..........................................................................4

III.  PARTIES ..............................................................................................................5

    A.    Plaintiffs .....................................................................................................5

    B.    Defendant ..................................................................................................13

IV.   FACTUAL ALLEGATIONS .............................................................................13

V.    CLASS ACTON ALLEGATIONS ....................................................................50

VI.   CLAIMS FOR RELIEF .....................................................................................54

FIRST CAUSE OF ACTION VIOLATION OF CALIFORNIA'S UNFAIR
    COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200) ..........................54

SECOND CAUSE OF ACTION NEGLIGENCE AND NEGLIGENCE PER SE .........56

THIRD CAUSE OF ACTION UNJUST ENRICHMENT .................................................58

PRAYER FOR RELIEF ......................................................................................................59

JURY TRIAL DEMANDED ...............................................................................................59

For their First Amended Complaint against Defendant Amazon.com, Inc. ("Amazon"), Plaintiffs, on their own behalf and on behalf of all others similarly situated, allege as follows:

## I.    INTRODUCTION

1.      California law rightly prohibits profiteering from a public health crisis. In enacting some of the nation's strongest prohibitions on price gouging, California's legislature recognized that unscrupulous sellers can take advantage of emergency conditions to overcharge consumers for goods that are vital to their health, safety, general welfare, and normal daily lives. Exploiting consumers in their most vulnerable hour is not only contrary to basic human decency—it is a criminal offense in California and presumptively unlawful under California's Unfair Competition Law. *See* Cal. Penal Code §§ 396(h), (i).

2.      According to California's price-gouging statute, California Penal Code § 396(a), the California legislature enacted this statute because during a declared state of emergency "some merchants have taken unfair advantage of consumers by greatly increasing prices for essential consumer goods and services." The statute explains that, while "the pricing of consumer goods and services is generally best left to the marketplace under ordinary conditions, when a declared state of emergency or local emergency results in abnormal disruptions of the market, the public interest requires that excessive and unjustified increases in the prices of essential consumer goods and services be prohibited." *Id.*

3.      With this action, Plaintiffs seek to hold Amazon accountable for its unlawful price increases during the COVID-19 pandemic.

4.      In these unprecedented times, many American consumers have experienced their first taste of scarcity and financial distress, and for vulnerable Americans who already live on the precipice, things have gotten demonstrably worse. In the wake of the outbreak and spread of COVID-19, essential consumer goods have disappeared (or appear unpredictably) on retails shelves, and shoppers must often wait hours to enter popular brick-and-mortar retail outlets in the hopes that supplies have been restocked.

5.      With "stay-at-home" orders prevailing across the country, and medical experts repeatedly warning about the ease of infection should Americans congregate in public, consumers

also know that any retail excursion could have perilous consequences for themselves or loved ones, no matter what precautions are taken. Officials with the Centers for Disease Control ("CDC") have cautioned that leaving the home is particularly dangerous for the elderly and those with preexisting medical conditions. And for those Americans who are COVID-19 positive (even if asymptomatic), or who believe they have been exposed to COVID-19, venturing outside the home to make retail purchases comes with a high risk of spreading this extremely contagious and deadly disease to their neighbors and community.

6.      In this environment—consistent with the directions of government and public health officials—consumers have understandably turned to online purchasing, and Amazon in particular, to fulfill their essential needs. Without venturing into public and risking exposure to themselves and others, with just a few clicks Americans can purchase consumer goods from Amazon that will be delivered to their homes. Indeed, Amazon's sales have never been higher, and since the COVID-19 pandemic began, its sales in some categories (*e.g.*, home items) have been pushed ***up more than 1,000 percent***.[1] But Amazon's position as a vital seller in times of contagion does not place it above the law. If anything, the increased demand for its platform makes price gouging by Amazon all the more unconscionable. Like every seller, Amazon has an obligation under California law to ensure that its pricing does not exploit consumers facing emergency conditions. Amazon has not abided by that obligation. In fact, as the COVID-19 crisis has escalated, so too have Amazon's prices for the goods consumers require to remain healthy, protected, and nourished. Just by way of example, after COVID-19 was declared a public health emergency by California officials, certain Amazon prices increased as follows:

- **Face Masks**: Increases up to ***1,800 percent***, from $4.21 to $79.99;

- **Pain Reliever**: Increases up to ***233 percent***, from $18.75 to $62.40;

- **Cold Remedies:** Increases up to ***674 percent***, from $4.65 to $35.99;

- **Toilet Paper:** Increases up to ***233 percent***, from $30 to $100;

---

[1] *See* https://www.wsj.com/articles/amazon-struggles-to-find-its-coronavirus-footing-its-a-time-of-great-stress-11585664987, last visited July 1, 2020.

FIRST AMENDED CLASS ACTION COMPLAINT - 2
Case No.: 4:20-cv-02782-JSW

- **Black Beans:** Increases up to ***672 percent***, from $3.17 to $24.50;

- **Baking Soda**: Increases up to ***1,400 percent***, from $2.00 to $29.99;

- **Flour:** Increases up to ***400 percent***, from $22.00 to $110.00;

- **Yeast:** Increases up to ***625 percent***, from $7.02 to $50.95; and

- **Disinfectant Wipes:** Increases up to ***1,421 percent***, from $11.50 to $174.96.

7.     All of these (and many more) Amazon price increases are flagrantly unlawful under California law, which makes presumptively illegal any price increase exceeding ***10 percent*** during a state or local emergency. *See* Cal. Penal Code § 396(b). Many of Amazon's price increases exceeded the statutory threshold by more than ***1,000 percent***. Some of the unlawful increases were on sales of products supplied by third parties, sales which Amazon controls and reaps huge profits from. Amazon is the functional seller of these products and is responsible when price-gouged sales violate the law. But in addition, Amazon has inflated prices on its own inventory of products that Amazon supplies and sells directly to consumers. A study by the Public Interest Research Group ("PIRG") shows that, in February 2020, Amazon increased those prices by more than 50 percent on one-sixth of public health products used to combat COVID-19.[2] And perhaps most troublingly, Amazon has maintained its unlawfully high prices on many essential items while publicly trumpeting its efforts to prevent price gouging by third-party suppliers.

8.     To safely obtain essential goods during the COVID-19 crisis, Plaintiffs Alvin Greenberg, Michael Steinberg, and Julie Hanson purchased items from Amazon at prices that far exceeded California's statutory threshold. Amazon profited unlawfully from these sales, and Plaintiffs were harmed commensurately. On behalf of themselves, and a Class of consumers similarly situated, Plaintiffs seek damages, restitution, injunctive relief, and all other available remedies.[3]

---

[2] *See* https://uspirgedfund.org/resources/usf/analysis-coronavirus-spike-most-surgical-mask-sanitizer-prices-least-50-amazon, last visited July 1, 2020.

[3] In bringing this action, Plaintiffs and their counsel are acutely aware of the severe hardship that COVID-19 has imposed on all segments of society, including all people who rely on Amazon to deliver vital goods and services. Nevertheless, given the ongoing nature of the harm alleged herein, and to preserve all rights, Plaintiffs cannot delay this filing. To minimize burden on the Court and to reasonably accommodate Amazon, Plaintiffs will make every reasonable scheduling

## II.    JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction because this is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), which confers original jurisdiction on the federal courts for any class action in which any member of the Class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate $5,000,000, exclusive of interest and costs. Plaintiffs allege that the total claims of individual Class members in this action are in excess of $5,000,000, as required by 28 U.S.C. § 1332(d)(2) & (6). Plaintiffs are citizens of California, whereas Defendant is a citizen of Washington, satisfying 28 U.S.C. § 1332(d)(2)(A). Furthermore, more than two-thirds of all members of the proposed Class are citizens of California, where this action is being filed, and the total number of Class members is greater than 100, as required by 28 U.S.C. § 1332(d)(5)(B). Federal subject matter jurisdiction thus exists.

10.     Defendant has minimum contacts with the United States, this judicial district, and California, and has intentionally availed itself of the laws of the United States and California by conducting a substantial amount of business throughout California, including in the sale of goods to Plaintiffs and others residing in California. This Court accordingly has personal jurisdiction over Defendant.

11.     Venue is appropriate in this District because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District. *See* 28 U.S.C. § 1391(b)(2). In particular, Plaintiffs Alvin Greenberg and Michael Steinberg reside in this District (in Marin and Alameda counties, respectively) and purchased products from Amazon during the relevant period. As alleged herein, some of those products were price-inflated by unlawful amounts following California's declared states of emergency, including emergency declarations issued by Marin and Alameda county officials.

---

accommodation, including with respect to Amazon's deadline to respond to this First Amended Complaint.

### III.    PARTIES

**A.    Plaintiffs**

12.    Plaintiff Alvin Greenberg, Ph.D. is 73 years old and resides in San Rafael, California. San Rafael is in Marin County.

13.    Dr. Greenberg is a practicing toxicologist. He served previously as Chair of the Bay Area Air Quality Management District Hearing Board, a Member of the California Occupational Health and Safety Standards Board (appointed by the Governor), and Assistant Deputy Chief for Health, Cal-OSHA.

14.    To combat the spread of COVID-19, Marin County issued a Shelter-in-Place Order on March 16, 2020.[4] The Order instructed residents such as Mr. Greenberg to "self-isolate in their place of residence to the maximum extent feasible."[5] Marin County officials implored residents to leave their homes "as infrequently as possible and only for approved activities."[6] While discouraging avoidable excursions, Marin County officials reminded residents that they could still "go online, purchase items, and have them delivered to [their] home."[7] This guidance was reiterated by the California Department of Health, which on March 16, 2020 advised individuals over the age of 65, such as Dr. Greenberg, to "[r]emain at home until further guidance is issued" and to "[c]onsider on-line ordering for food and other supplies."[8]

15.    Marin County renewed its Shelter-in-Place Order on March 31, 2020, expanding it to make social distancing mandatory.[9]  The Shelter-in-Place Order was further renewed by subsequent

---

[4] *See* https://coronavirus.marinhhs.org/sites/default/files/Files/Shelter%20in%20Place/Shelter%20in%20Place%20Order%2016%20March%202020.pdf, last visited July 1, 2020.

[5] *Id.*

[6] https://coronavirus.marinhhs.org/faqs/en (FAQ: "What can I do to slow the spread of COVID-19"), last visited July 1, 2020.

[7] *See id.* (FAQ: "Can I still order the things I need online from businesses and have them delivered to my home?"), last visited July 1, 2020.

[8] *See* https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/Self_Isolation_Guidance_03.16.20.pdf, last visited July 1, 2020.

[9] *See* https://coronavirus.marinhhs.org/sites/default/files/2020-03/marin_final-superseding-shelter-in-place-order.pdf, last visited July 1, 2020.

pronouncements, and remains in place (in modified form) as of the filing of this First Amended Complaint.

16.     On or around April 21, 2020, Dr. Greenberg spoke with his girlfriend, Julie Hoemke, who resides in San Jacinto, California. Ms. Hoemke lives with three of her children and a granddaughter who, at this time, was six months old. Consistent with guidance from public health officials, Ms. Hoemke had been regularly disinfecting the surfaces of her home to protect herself and family from COVID-19. She had been using bleach for this purpose but had run out of her supply. Ms. Hoemke visited and called multiple retailers in her vicinity—including grocery stores, Home Depot, Lowes, and Walmart—in hopes of securing a replacement supply of bleach. The retailers, however, were all sold out of bleach and other disinfectants.

17.     Hearing this, Dr. Greenberg endeavored to locate bleach that could be shipped to Ms. Hoemke. Dr. Greenberg did not, however, feel safe visiting retail outlets in and around his San Rafael home. COVID-19 was spreading at this time and at 73 years of age, and with asthma, Dr. Greenberg recognized that he was at heightened risk of experiencing complications should he come into contact with the virus. Heeding public health guidance, Dr. Greenberg instead looked online for a supplier of bleach. The only online retailer he could locate with any bleach in stock was Amazon, which on April 21, 2020 was selling three-bottle containers of Clorox Concentrated Germicidal Bleach for $58.19. From his professional training, Dr. Greenberg was generally aware that bleach is effective in combatting viruses. Dr. Greenberg had also reviewed the CDC's and EPA's websites to confirm as much. The particular Clorox product Mr. Greenberg located on Amazon features a higher concentrate of sodium hypochlorite, the active ingredient that kills viruses.

18.     Dr. Greenberg recognized immediately that $58.19 was an exorbitant price for three bottles of Clorox Concentrated Germicidal Bleach. But under the circumstances, he saw no meaningful choice but to purchase it from Amazon. Even if this product could be obtained from stores in his area, and there was no assurance of that given retail scarcity of COVID-combatting products, as indicated by Ms. Hoemke's inability to find bleach at local retailers, Dr. Greenberg did not feel safe venturing into retail outlets, nor would this have been consistent with public health guidance prevailing in Marin County. The only alternative was to wait in hopes that other online

retailers would restock the product, but it was unclear when (if ever) this would occur. At the time, Amazon itself purported to only have six boxes of Clorox Concentrated Germicidal Bleach remaining. With COVID-19 spreading rapidly, and the safety of his girlfriend and family imperiled, Dr. Greenberg did not believe that waiting was an option. Dr. Greenberg accordingly purchased the product at the listed price of $58.19. Dr. Greenberg paid for the bleach out-of-pocket and has not been reimbursed.

19.     The price Dr. Greenberg paid for Clorox Germicidal Bleach vastly exceeded the price that prevailed on Amazon prior to declared states of emergency in California. On February 2, 2020, immediately prior to the first declared state of emergency by Santa Clara County, the specific product Dr. Greenberg purchased sold on Amazon for **$21.74**.[10] By March 3, 2020—after several additional states of emergency were declared in California, including just south of Dr. Greenberg in San Francisco—Amazon's price had more than doubled, reaching **$48.93**.[11] Following declarations of states of emergency in Marin County, and by California's Governor Newsom, the price rose again by nearly twenty percent to reach **$58.19**.[12] Overall, the price Dr. Greenberg paid for Clorox Germicidal Bleach ($58.19) was ***168%*** higher than the price Amazon charged for the same product prior to the first declared state of emergency in California ($21.74).[13]

---

[10] https://keepa.com/#!product/1-B06XZJH8XJ, last visited July 4, 2020.

[11] *Id.*

[12] *Id.*

[13] *Id.*



20.     Plaintiff Michael Steinberg lives in Oakland, California, which is in Alameda County. In response to the COVID-19 pandemic, Alameda County declared a State of Emergency on March 1, 2020.

21.     To prevent a larger outbreak of COVID-19, on March 16, 2020 Alameda County issued a Shelter-in-Place Order, which instructed its citizens to "self-isolate in their places of residence to the maximize extent feasible."[14] On that same day, similar orders were issued by five surrounding Bay Area counties, as well as the City of Berkeley, with a total population exceeding six million people covered by the orders. A Shelter-in Place-Order is still in effect in Alameda County, and was updated subsequent to the initial order, including on April 29, 2020, May 18, 2020 and June 18, 2020.[15] While discouraging avoidable excursions, like in Marin County, Alameda County officials informed residents that they could still "go online, purchase items, and have them delivered to [their] home."[16] The Alameda County Interim Health Office has explained that sheltering in place is necessary because of, among other things, "evidence of continued significant community transmission of COVID-19 within the County and throughout the Bay Area," that "the virus can

---

[14] http://www.acgov.org/documents/Final-Order-to-Shelter-In-Place.pdf, last visited July 1, 2020.

[15] *See* http://www.acphd.org/media/587163/alameda-county-health-officer-order-20-14-a-english.pdf, last visited July 1, 2020.

[16] *See* https://covid-19.acgov.org/index.page (FAQ: "Can I still order the things I need online from businesses and have them delivered to my residence?"), last visited July 1, 2020.

survive for hours to days on surfaces and be indirectly transmitted between individuals," "[b]ecause even people without symptoms can transmit the infection, and because evidence shows the infection is easily spread, gatherings and other direct or indirect interpersonal interactions can result in preventable transmission of the virus."[17]

22.     Consistent with these orders in Alameda County and elsewhere in California, and for the health and safety of himself and his family, Mr. Steinberg has left his home as infrequently as possible during the COVID-19 pandemic, and only for essential activities. He also prepares his meals at home to minimize contact with outside food vendors, which includes making his own bread.

23.     Although fearful when he leaves his home, Mr. Steinberg during the pandemic has attempted to purchase yeast, a necessary ingredient for bread, at local grocery stores, but it has been unavailable. Indeed, yeast has been widely unavailable during the pandemic. John Heilman, vice president of yeast manufacturing for AB Mauri, makers of Fleismann's Yeast, told USA Today that the two to three weeks of dry yeast buffer inventory Feischmann's had on hand "was gone almost instantly" after the beginning of the COVID-19 pandemic, and estimated on April 23, 2020 that it would take approximately one to two months to get store shelves stocked again.[18]

24.     Finding no yeast in his local grocery stores, Mr. Steinberg looked for yeast on the internet. On April 3, 2020, Mr. Steinberg saw a sales listing for a two-pound pouch of Red Star Active Dry Yeast on Amazon for **$39.97**. He looked online at the website of another large retailer but could not find any yeast for sale.

25.     Mr. Steinberg was unable to find yeast elsewhere, he understood the government directives to shelter in place, and he recognized the importance of making food at home in the midst of the pandemic. Thus, he felt that he had no meaningful choice but to purchase yeast on Amazon and accept the terms Amazon was offering, and he did so.

---

[17] *See* http://www.acphd.org/media/577582/alameda-county-health-officer-order-20-11-english.pdf, at ¶ 9, last visited July 1, 2020.

[18] https://www.usatoday.com/story/money/food/2020/04/23/coronavirus-pantry-baking-yeast-shortage/3004274001/, last visited July 1, 2020.

26.     Nonetheless, Mr. Steinberg was still very upset about the price of yeast on Amazon, a basic household staple, and believed that he was being exploited because there was nowhere else to buy it. So, in the week following his April 3, 2020 purchase, he complained to Amazon about the price and the apparent price gouging. He made multiple phone calls, but the calls got him nowhere. It seemed that each Amazon agent he spoke with had no idea what was going on, apart from noting his prior call and concern. They read from what seemed to be a script, which was nonresponsive to anything he was trying to communicate. When Mr. Steinberg complained about the price jump and pointed out that he believed the Amazon website tracks prices, a person he thinks was a supervisor said that he had no access to that information, and that it is up to another department to figure out whether a price is appropriate. Feeling frustrated but out of options, Mr. Steinberg kept the yeast and received no discount or rebate.

27.     The price Mr. Steinberg paid for Red Star Active Dry Yeast vastly exceeded the price on Amazon prior to declared states of emergency in California. On February 2, 2020, immediately prior to the first declared state of emergency by Santa Clara County, the specific product Mr. Steinberg purchased sold on Amazon for **$7.02**.[19] By March 3, 2020—after several additional states of emergency were declared in California, including in Bay Area Counties such as Alameda County—Amazon's price had gone up more than 61%, to **$11.35**.[20] Following state-of-emergency declarations elsewhere in California and by California's Governor Newsom, the price more than quadrupled to reach **$50.95**, which was 625% higher than the price on February 2, 2020.[21] The slightly lower price that Mr. Steinberg paid for Red Star Active Dry Yeast on April 3, 2020 ($39.97) was more than ***469%*** higher than the price Amazon charged for the same product prior to the first declared state of emergency in California ($7.02).[22]

---

[19] https://keepa.com/#!product/1-B005KR0MZG, last visited July 4, 2020.

[20] *Id.*

[21] *Id.*

[22] *Id.*



28.     Plaintiff Julie Hanson is lives in Diamond Springs, California, which is in El Dorado County.

29.     In order to slow the spread of COVID-19, El Dorado County issued a Shelter-in-Place directive on March 19, 2020.[23] California's Governor Newsom issued a statewide Shelter-in-Place Order the same day.[24] As with the statewide directive, El Dorado County's Order was designed to ensure "that the maximum numbers of people self-isolate in their place of residence to the greatest extent feasible."[25] Action was needed, El Dorado County concluded, because of "evidence of increasing occurrence of COVID-19 in the surrounding counties and the State of California."[26] Officials warned in particular that individuals with underlying health conditions faced enhanced "risk for serious health complications, including death, from COVID-19."[27] El Dorado County's Shelter-in-Place Order came on the heels of statewide guidance from the California Department of Health, which highlighted the "elevated risk" for health-compromised individuals and advised them to

---

[23] *See* https://www.edcgov.us/Government/hhsa/Documents/El%20Dorado%20-%20shelter-in-place%20directive%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.pdf, last visited July 1, 2020.

[24] *See* https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf, last visited July 1, 2020.

[25] *See* https://www.edcgov.us/Government/hhsa/Documents/El%20Dorado%20-%20shelter-in-place%20directive%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.pdf, last visited July 1, 2020.

[26] *See id.*

[27] *See id.*

"[c]onsider on-line ordering for food and other supplies" to keep themselves and loved ones healthy.[28]

30.     Ms. Hanson is 56 years old and suffers from underlying health conditions, some of which heighten the risk she will experience adverse, and potentially fatal, consequences should she come in contact with the novel coronavirus. Ms. Hanson has Parkinson's disease and bronchiectasis, a lung condition that causes coughing due to scarred tissue in the bronchi, or the passages that let air into the lungs. Severe bronchiectasis can lead to respiratory and heart failure. Ms. Hanson was also in a head-on vehicle collision in 2018, which has impaired her mobility.

31.     Prior to the outbreak of COVID-19, Ms. Hanson was just beginning to regain mobility sufficient to shop outside her home. But as COVID-19 spread through California in February 2020, Ms. Hanson decided, particularly in light of her health and lung conditions, that it was not safe for her to make retail excursions. This decision comported with public health guidance, including subsequent directives issued by El Dorado County and California health officials, regarding the need to self-isolate, particularly for persons with underlying health conditions. To meet her daily needs, and provide for her family, Ms. Hanson turned to Amazon and the home delivery it offers. Since the outbreak of COVID-19, Ms. Hanson has purchased certain items from Amazon for herself, and others for daughters who live in their own residences and receive support from Ms. Hanson.

32.     On or around April 14, 2020, Ms. Hanson became aware that one of her daughters, Sabrina Gates, had acquired a kitten and was experiencing an outbreak of fleas in her own household. Ms. Gates lives with three young children, one of whom has Type 1 diabetes, a condition that increases the likelihood that COVID-19 will lead to serious health complications. Like her mother, Ms. Gates has generally stayed inside her home throughout the COVID-19 pandemic to protect herself and particularly her diabetic son.

33.     Ms. Hanson undertook to locate products that might alleviate her daughter's flea infestation. Ms. Hanson found one such product— Zodiac Flea & Tick Spray—on Chewy.com, an

---

[28] *See* https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/Self_Isolation_Guidance_03.16.20.pdf, last visited July 1, 2020.

online pet-supply retailer, but the product was not available for shipment. Ms. Hanson subsequently found the same product on Amazon and, on April 30, 2020, purchased it for the price of $14.19. Ms. Hanson paid out-of-pocket and has not been reimbursed.

34.     The price Ms. Hanson paid for Zodiac Flea & Tick Spray vastly exceeded the price on Amazon prior to declared states of emergency in California. On March 3, 2020, immediately prior to Governor Newson's declaration of emergency, Amazon sold this product for **$8.99**. The price Ms. Hanson paid—**$14.19**—was *58%* higher than the pre-emergency price.[29]



## B.     Defendant

35.     Defendant Amazon is the world's largest online retailer. Amazon is a corporation organized and existing under the laws of Delaware and with its principal place of business in Seattle, Washington.

## IV.     FACTUAL ALLEGATIONS

### *Outbreak of Covid-19 and the Early Impact on California's Population*

36.     In late 2019, an outbreak of respiratory illness resulting from a novel coronavirus was first identified in Wuhan City, Hubei Province, China. That illness, now known as COVID-19, has spread across the world. COVID-19 has been designated a pandemic by the World Health Organization, the first pandemic resulting from a coronavirus. As of the date of this First Amended

---

[29] *See* https://keepa.com/#!product/1-B001OVGJUO, last visited July 4, 2020.

Complaint, more than eleven million confirmed cases of COVID-19 have been reported across the globe, and more than 530,000 persons have died from their illness.[30]

37.     California was one of the first states affected by the pandemic and one of the first to see COVID-19 cases. On January 17, 2020, travel to California was affected when the CDC began health screenings of passengers on direct or connecting flights from Wuhan to the "three U.S. airports that receive most of the travelers from Wuhan, China: San Francisco (SFO), New York (JFK), and Los Angeles (LAX) airports."[31] The third confirmed COVID-19 case in the United States was an Orange County man diagnosed on January 26, 2020. Shortly thereafter, the U.S. State Department evacuated 195 U.S. citizens and from Hubei Province, placing them in isolation at the March Air Reserve Base in Riverside, California. Around the same time, new COVID-19 cases emerged in Santa Clara County in and around "Silicon Valley." On January 31, 2020, the CDC confirmed that a Santa Clara man had tested positive for the virus, and an unrelated Santa Clara woman tested positive two days later. Around the same time, two additional cases were confirmed just south in San Benito County. By February 12, 2020, eight of the nation's fourteen confirmed COVID-19 patients were in California, indicating that the virus was clustering in the state.[32]

38.     In the ensuing weeks, California facilities were used to quarantine nearly 700 U.S. nationals evacuated from Hubei Province and the Diamond Princess Cruise ship, which had been overrun by the virus. More than a dozen of the evacuees tested positive for the virus, and many more were perilously exposed.

39.     Things took an even more dire turn on February 26, 2020, when health officials confirmed that a Solano County patient had tested positive for COVID-19 despite having no known exposure to the virus through travel or contact with an affected individual. This was the first confirmation that COVID-19 was being transmitted in the United States through "community

---

[30] *See* https://ourworldindata.org/coronavirus, last visited July 6, 2020.

[31] *See* https://www.cdc.gov/media/releases/2020/p0117-coronavirus-screening.html, last visited July 1, 2020.

[32] *See* https://www.nytimes.com/2020/01/31/us/coronavirus-california.html?action=click&module=RelatedLinks&pgtype=Article, last visited July 1, 2020.

FIRST AMENDED CLASS ACTION COMPLAINT - 14
Case No.: 4:20-cv-02782-JSW

spread," suggesting that untold numbers of citizens were also affected but asymptomatic or otherwise not being tested for COVID-19.

40.    In their February warnings to citizens, California officials emphasized the increased risk of community spread due to the frequency of travel between China and localities in California. For example, on February 25, 2020, San Francisco issued a press release quoting Dr. Tomas Aragon, the San Francisco Health Officer, stating that there was a "growing likelihood" of COVID-19 cases in San Francisco "[g]iven the high volume of travel between San Francisco and mainland China."[33] Indeed, given the substantial amount of travel between the state and China, medical experts warned early on that California was literally at the "front line" of the crisis.[34]

41.    While testing has remained limited, confirmed COVID-19 cases in California have increased exponentially since February, reaching 264,832 confirmed cases as of the date of this filing. At least 6,373 Californians have died from COVID-19.[35]

### *Emergency Declarations and "Shelter-in-Place" Orders*

42.    California officials were among the nation's first to take aggressive action to combat the spread of COVID-19. Santa Clara County health officials declared a state of emergency on February 3, 2020, one week after Santa Clara County's first confirmed COVID-19 case. Other California cities and counties followed in rapid succession.[36] On March 4, 2020, shortly after the first confirmed COVID-19 death in California, Governor Newsom proclaimed a State of Emergency pursuant to Government Code § 8625(c). As of Governor Newsom's proclamation, 53 of the 129 confirmed COVID-19 cases in the United States were patients in California.[37]

---

[33] *See* https://www.sfdph.org/dph/alerts/files/02.25.20_Public_Health_Update_Novel_Coronavirus.pdf, last visited July 1, 2020.

[34] *See* https://www.nytimes.com/2020/01/31/us/coronavirus-california.html?action=click&module=RelatedLinks&pgtype=Article, last visited July 1, 2020.

[35] *See* https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/, last visited July 6, 2020.

[36] *See infra*, Part V, identifying the dates of state-of-emergency declarations by California officials in February and March 2020.

[37] *See* https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf, last visited July 1, 2020.

43.     Once state-of-emergency orders had issued, local and state governments began to impose "shelter-in-place" orders requiring residents to remain home except for essential activities. On March 16, Governor Newsom instructed all Californians over 65 and anyone with a chronic medical condition to engage in "self-isolation" to reduce the risk of COVID-19.[38] To obtain necessary consumer goods, Governor Newsom directed all such individuals to "[c]onsider on-line ordering for food and other supplies."[39] Governor Newsom expanded this directive to cover all Californians on March 19, 2020, instructing all "individuals living in the State of California to stay home or at their place of residence."[40]

44.     Local California governments issued similar and often more restrictive "stay-at-home" directives. For example:

- **March 16, 2020**: Santa Clara, San Francisco, Alameda, San Mateo, Contra Costa, and Marin counties, along with the City of Berkeley, instructed citizens to "self-isolate in their places of residence to the maximum extent feasible."[41] These orders covered the entire California Bay Area, with a population exceeding six million people.

- **March 17, 2020**: Monterey County, San Benito, and Sonoma issued shelter-in-place orders.[42]

---

[38] *See* https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/Self_Isolation_Guidance_03.16.20.pdf, last visited July 1, 2020.

[39] *Id.*

[40] *See* https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf, last visited July 1, 2020.

[41] *See* https://www.sfdph.org/dph/alerts/files/HealthOrderC19-07-%20Shelter-in-Place.pdf]; http://www.acgov.org/documents/Final-Order-to-Shelter-In-Place.pdf, last visited July 1, 2020; https://cchealth.org/coronavirus/pdf/HO-COVID19-SIP-0316-2020.pdf; https://www.marincounty.org/main/county-press-releases/press-releases/2020/hhs-covid-shelterinplace-031620 last visited July 1, 2020; https://www.mercurynews.com/2020/03/16/coronavirus-read-shelter-in-place-order-from-six-bay-area-counties/, last visited July 1, 2020.

[42] *See* https://www.thecalifornian.com/story/news/2020/03/17/monterey-county-health-officer-orders-shelter-place/5073496002/, last visited July 1, 2020; https://hhsa.cosb.us/wp-content/uploads/2020/03/SAN-BENITO-COUNTY-ISSUES-PUBLIC-HEALTH-ORDERPR031720VF.pdf, last visited July 1, 2020; http://sonomacounty.ca.gov/CAO/Press-Releases/Health-Officer-Orders-County-Residents-Shelter-in-Place/, last visited July 1, 2020.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- **March 19, 2020**: Los Angeles issued its "shelter-in-place" order, requiring residents to "isolate themselves in their residences."[43] Sacramento, Solano, Yolo, Yuba, and Sutter counties issue their own similar orders.[44] These orders collectively applied to more than twelve million people.

- **March 24, 2020**: Orange County directed its residents "not to leave the premises of their primary residence" except for basic needs and to practice "social distancing" when they do.[45]

45.     California's "shelter-in-place" orders generally require "social distancing," that is, anyone exiting their home remain "six feet apart at all times."[46] In issuing California's statewide "stay-at-home" order, Governor Newsom specifically instructed the entire state to "at all times practice social distancing."[47]

### *Hoarding and Retail Scarcity*

46.     As COVID-19 spread through the United States, and government efforts to combat the virus intensified, consumers began to stockpile essential items. By late January, prior to the first declared state of emergency declaration in California (Santa Clara's February 3 declaration), there were already reports that consumers were buying out retail stock of surgical masks and N95 respirators.[48] The research firm Nielson found that the sale of medical supplies and rubbing alcohol

---

[43] *See* https://www.lamayor.org/sites/g/files/wph446/f/page/file/SaferAtHomeAPR10.pdf, last visited July 1, 2020.

[44] *See* https://www.abc10.com/article/news/health/coronavirus/four-other-local-counties-are-also-order-residents-to-shelter-in-place/103-7e187abc-e6d2-4ed8-a4d0-7b3b7d2fc216, last visited July 2, 2020.

[45] *See* https://www.ocso.com/Portals/0/OC-Emergency-Executive-Order-2020-05-032620.pdf, last visited July 2, 2020.

[46] *See* https://www.sfdph.org/dph/alerts/files/StayHome-03272020.pdf, last visited April 21, 2020.

[47] *See* https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf, last visited July 2, 2020.

[48] *See* https://www.cnn.com/2020/01/28/health/coronavirus-us-masks-prevention-trnd/index.html, last visited July 2, 2020.

surged nearly twenty percent after the first reported case of COVID-19 in the United States on January 30.[49]

47.     In February and March, the reports of stockpiling, scarcity, and hoarding escalated. Nielson found that sales of medical supplies and rubbing alcohol jumped 65 to 85 percent after there was a report of person-to-person transmission of COVID-19 on February 29. The firm also found that powdered milk sales jumped 85 percent, and rice and bean sales increased 25 to 37 percent.[50] For the week ending on March 7, 2020, compared to the same week a year earlier, sales of hand sanitizer, aerosol disinfectants, and multipurpose cleaners were 470, 385.3, and 148.2 percent higher, respectively.[51] Local news organizations in California frequently reported on scarcity and hoarding, and these reports only heightened consumer panic. For example, on March 18, a local news station in the San Francisco Bay Area posted an article online, "Coronavirus impact: Why shoppers are hoarding toilet paper, supplies and groceries."[52] The article discussed "one of the most visible reaction[s] to the coronavirus – empty shelves at the grocery stores," and interviewed a local shopper who had gone to a large grocery store hoping to buy paper towels and toiletries, but came away with nothing.[53] The article's authors interviewed a local marketing professor, Michal Strahilevitz, to explain the hoarding and scarcity: "when something becomes scarce, everybody wants more of because they're afraid next time . . . [t]here won't be any toilet paper at all."[54]

48.     Empty retail shelves were not an isolated phenomenon in California—they persisted across the state. By March 3, 2020, Costco stores throughout California began posting signs that they were out of water, and there were reports of "shoppers mak[ing] a mad dash for Clorox wipes, all

---

[49] *See* https://abc7news.com/hoarding-buying-frenzy-empty-grocery-shelves-toilet-paper-shortage/6025373/, last visited July 2, 2020.

[50] *Id.*

[51] *See* https://www.npr.org/2020/03/16/816404689/spiking-demand-for-sanitizer-canned-goods-leaves-stores-struggling-to-keep-up, last visited July 2, 2020.

[52] *See* https://abc7news.com/hoarding-buying-frenzy-empty-grocery-shelves-toilet-paper-shortage/6025373/, last visited July 2, 2020.

[53] *Id.*

[54] *Id.*

while murmurs of the spread of the coronavirus rumble[d] through the crowds."[55] Consumers also stockpiled food items, with reports of "panic buying" cleaning out retail shelves across the state.[56] In the Bay Area, crowds lined up outside retail stores and "picked shelves clean of frozen foods, meat, bread and toilet paper, as anxiety over coronavirus led many to stock up on supplies."[57] This pattern was not limited to large retailers, as even "small neighborhood stores [were] getting raided by coronavirus hoarders."[58] Nor was hoarding limited to California's urban centers. In Chico, one shopper said this about her trip to Safeway: "Toilet paper, gone. Meat, gone. Fruit and vegetables, gone. It's pretty bad in there."[59]

49.     By the middle of March, the California Grocers Association was pleading with Californians to stop "hoarding and overbuying," as this was making it impossible to deliver sufficient supplies to retail stores.[60] To curtail buying, many retailers were forced to ration products in high demand.[61]

### *Consumers Turn Increasingly to Online Purchasing, And Amazon in Particular*

50.     In response to retail shortages and to limit exposure to the coronavirus, more consumers have been doing their shopping online, increasing consumer demand and reliance on online retailers. According to a Nielson survey, in mid-March when the concerns over COVID-19 transmission rapidly escalated, approximately "one-quarter of shoppers said they expected to shop

---

[55] *See* https://www.nbclosangeles.com/news/costco-panic-buying-coronavirus/2321449/, last visited July 2, 2020.

[56] *See* https://abc7news.com/costco-coronavirus-bay-area-san-jose-panic-buying/6011289/, last visited July 2, 2020.

[57] *See* https://www.mercurynews.com/2020/03/14/coronavirus-shoppers-clear-grocery-store-shelves-as-anxiety-ratchets-up/, last visited July 2, 2020.

[58] *See* https://www.latimes.com/california/story/2020-03-14/even-liquor-stores-are-getting-raided-by-people-hoarding-because-of-coronavirus, last visited July 2, 2020.

[59] *See* https://krcrtv.com/news/coronavirus/it-feels-like-black-friday-dozens-line-up-at-grocery-stores-to-stock-up-on-supplies, last visited July 2, 2020.

[60] *See* https://abc7news.com/coronavirus-us-what-is-news-the/6020212/, last visited July 2, 2020.

[61] *See* https://sacramento.cbslocal.com/2020/03/16/grocery-hoarding-crackdown-coronavirus/, last visited July 2, 2020.

online more frequently—or for the first time—to avoid germs in public places."[62] The data confirm that this has occurred. The following graph shows a large increase in March sales of consumer packaged goods ("CPG"), in store and online as compared to the same month a year prior, with an astonishing 91 percent increase for online sales. In the two weeks ending on March 21, upwards of 35 percent more people had shopped online for CPG items as compared with a typical week.[63]



51.     An unprecedented demand on internet retailers has also led to product scarcity online, with some retailers out of stock and experiencing shipping problems, including large delays.[64] Consumers thus have become only more reliant on Amazon—the world's largest online retailer—for essential consumer goods. Indeed, Amazon's sales account for ***almost half of all U.S. retail e-***

---

[62] *See* https://www.nielsen.com/us/en/insights/article/2020/tracking-the-unprecedented-impact-of-covid-19-on-u-s-cpg-shopping-behavior/, last visited July 2, 2020.

[63] *See id.*

[64] *See* https://www.digitalcommerce360.com/2020/03/20/a-viral-surge-how-the-coronavirus-is-impacting-shipping-and-delivery-of-online-orders/, last visited July 2, 2020.

FIRST AMENDED CLASS ACTION COMPLAINT - 20
Case No.: 4:20-cv-02782-JSW

*commerce.*[65] By comparison, Amazon's nine largest competitors have only a 1.1 to 6.6 percent share.[66] In terms of product diversity, Amazon sells twelve million products on the Amazon.com platform, with a particularly large range of consumer goods.[67] In 2018, it was estimated that Amazon had 1.5 billion items listed for sale and over 200 million users.[68]

52.    Industry observers have universally recognized that Amazon saw "unprecedented demand amid widespread coronavirus-related shutdowns."[69] As one observer put it, with "millions of Americans ordered to remain home, Amazon is now, more than ever, a lifeline for essentials for millions of people rather than just a convenient option for online shopping."[70] Amazon sales have skyrocketed. By April 12, 2020, consumer spending on Amazon had increased 44 percent over the year prior.[71] In a rapidly contracting economy, Amazon has hired more than 100,000 workers to address increased demand for its services, and is looking to hire 75,000 more.[72]

53.    One reason Amazon has seen its sales increase is that it can supply essential goods that are not always available on retail shelves in the COVID-19 era. In addition, Amazon offers consumers the unique ability to purchase all range of consumer goods without venturing outside their homes—something health officials have warned brings risk of potentially fatal infection. When Governor Newsom instructed elderly and compromised Californians to isolate amidst the

---

[65] *See* https://www.emarketer.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market, last visited July 2, 2020.

[66] *Id.*

[67] *See* https://0ca36445185fb449d582-f6ffa6baf5dd4144ff990b4132ba0c4d.ssl.cf1.rackcdn.com/IG_360piAmazon_9.13.16.pdf, last visited July 2, 2020; Amazon store directory, https://www.amazon.com/gp/site-directory?ref_=nav_em_T1_0_2_2_36__fullstore, last visited July 2, 2020.

[68] *See* https://www.businessinsider.com/amazon-price-changes-2018-8, last visited July 2, 2020.

[69] *See* https://www.forbes.com/sites/sergeiklebnikov/2020/04/14/jeff-bezos-gets-63-billion-richer-as-amazon-stock-hits-a-new-record-high/#732cf86953b0, last visited July 2, 2020.

[70] *See* https://www.vox.com/recode/2020/4/10/21215953/amazon-fresh-walmart-grocery-delivery-coronavirus-retail-store-closures, last visited July 2, 2020.

[71] *See* https://first.facteus.com/, last visited July 5, 2020.

[72] *See* https://techcrunch.com/2020/04/13/amazon-to-hire-75000-more-to-address-increased-demand-due-to-coronavirus-crisis/, last visited July 2, 2020.

coronavirus, he specifically advised them to "[c]onsider on-line ordering for food and other supplies."[73]

54.     The CDC has likewise advised all Americans to "[o]rder food and other items online for home delivery or curbside pickup (if possible)," and to "[o]nly visit the grocery store, or other stores selling household essentials, in person when you absolutely need to," as "[t]his will limit your potential exposure to others and the virus that causes COVID-19."[74] That concern is heightened for older adults and individuals with underlying health conditions, with the CDC advising that these Americans should consider "ways to get food, medicines, and essentials delivered to [their] home."[75] The CDC has also instructed individuals sick with COVID-19, or who believe they might have COVID-19, as follows: "Do not leave your home, except to get medical care. Do not visit public areas."[76]

55.     On March 4, 2020, Senator Edward J. Merkey (D-Massachusetts) wrote a letter to Amazon CEO Jeff Bezos about reports of price gouging on Amazon.[77] He stated that "[i]nternet-based retailers such as Amazon.com have a particular responsibility to guard against price gouging in current circumstances as consumers—who are finding the shelves of local brick-and-mortar stores bare, and who may wish to avoid venturing into crowded stores and shopping malls—turn to the internet."[78] Consistent with Senator Merkey's observation, and heeding the official guidance

---

[73] *See* https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/Self_Isolation_Guidance_03.16.20.pdf, last visited July 1, 2020.

[74] *See* https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/essential-goods-services.html, last visited July 2, 2020. Notably, a March, 2020 global survey of consumers, including those in the United States, found that 57 percent of consumers have altered their day-to-day activities to be as "contactless" as possible. *See* https://www.digitalcommerce360.com/2020/03/20/a-viral-surge-how-the-coronavirus-is-impacting-shipping-and-delivery-of-online-orders/, last visited July 2, 2020.

[75] *See* https://www.nfid.org/infectious-diseases/common-questions-and-answers-about-covid-19-for-older-adults-and-people-with-chronic-health-conditions/, last visited July 2, 2020.

[76] *See* https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html, last visited July 2, 2020.

[77] *See* https://www.markey.senate.gov/imo/media/doc/letter%20to%20Bezos%20re%20coronavirus%20price-gouging.pdf, last visited July 2, 2020.

[78] *Id.*

described above, consumers have turned to Amazon—the world's dominant online retailer—to obtain the goods they require to survive and endure in these unprecedented times.

56.     Amazon's own policies further push online consumers to shop on its e-commerce platform, Amazon.com. For example, under its "fair pricing" provisions, Amazon penalizes third-party suppliers who allow their products to be sold for lower prices outside Amazon.com.[79] Amazon's "fair pricing" policy states "Amazon regularly monitors the prices of items on our marketplaces," and that if it sees "pricing practices" on the Amazon.com platform "that harm[] customer trust, Amazon can remove the Buy Box [*i.e.*, the coveted one-click-to-buy button[80]], remove the offer, suspend the ship option, or, in serious or repeated cases, suspend[] or terminat[e] selling privileges."[81] One of the pricing practices Amazon identifies as "harmful" to customer trust is "[s]etting a price on a product or service that is significantly higher than recent prices offered *on or off* Amazon."[82]

57.     Under the "fair pricing" provision, "[a]ny single product or multiple products packages must have a price that is equal to or lower than the price of the same item being sold by the seller on other sites or virtual marketplaces."[83] The "fair pricing" provision "applies to both the individual product price as well as the collective price that the item or items are being sold for."[84] Amazon's "fair pricing" policy is in effect no different than its former explicit "price parity" (*i.e.*, platform most favored nation or "PMFN") provision, and ensures that Amazon's prices are equal to or better than prices on competing e-commerce sites. With this policy in place, prices on Amazon are generally favorable to online alternatives, further driving customers to Amazon during the COVID-19 pandemic.

---

[79] *See, e.g.*, https://www.inc.com/guadalupe-gonzalez/amazon-removes-price-parity-not-fair-price-rule-third-party-sellers-antitrust-violations.html, last visited July 2, 2020.

[80] *See infra*, ¶¶ 64, 66.

[81] *See* https://sellercentral.amazon.com/gp/help/external/G5TUVJKZHUVMN77V?language=en_US&ref=efph_G5TUVJKZHUVMN77V_cont_521, last visited July 2, 2020.

[82] *Id.* (emphasis added).

[83] *See* https://feedvisor.com/university/amazon-pricing-policy/, last visited July 2, 2020.

[84] *Id.*

58.     For all of the foregoing reasons, any "condition" Amazon purports to impose on its customers to compel arbitration of claims for price gouging during the COVID-19 pandemic is unconscionable, contrary to public policy, and otherwise unenforceable. The pandemic has fundamentally disrupted market conditions. Facing retail scarcity, "stay-at-home" orders and repeated warnings from government and public-health officials that public interaction could result in fatal exposure, Plaintiffs and members of the putative Class had no meaningful choice but to purchase consumer and other goods from Amazon. That Class members purchased products from Amazon at unconscionably inflated prices, sometimes exceeding 1,800 percent (*see infra*), itself attests to the lack of meaningful options. Just as the law mandates that Amazon may not exploit consumers by inflating prices, *see infra*, Amazon cannot limit consumers' rights in the midst of the COVID-19 pandemic through adhesive conditions imposed on a "take it or leave it" basis.

### *Price Gouging Prohibitions Were Triggered by COVID-19 and Remain in Effect*

59.     California law strictly prohibits price gouging during a declared emergency, including the COVID-19 crisis. In instituting this prohibition and explaining its policy grounds, California's legislature found that during a state of emergency "some merchants have taken unfair advantage of consumers by greatly increasing prices for essential consumer goods and services." Cal. Penal Code § 396(a). The legislature acknowledged that "[w]hile the pricing of consumer goods and services is generally best left to the marketplace under ordinary conditions, when a declared state of emergency or local emergency results in abnormal disruptions of the market, the public interest requires that excessive and unjustified increases in the prices of essential consumer goods and services be prohibited." *Id.*

60.     To discourage price gouging, and make the prohibition effective and enforceable, California law fixes a ten-percent threshold for price increases during a declared emergency. Price increases above that are presumptively unlawful. This prohibition extends to all consumer goods, emergency supplies, and medical supplies, among other product categories. Specifically, the governing statute provides in pertinent part:

> Upon the proclamation of a state of emergency declared by the President of the United States or the Governor, or upon the declaration of a local emergency by

an official, board, or other governing body vested with authority to make that declaration in any county, city, or city and county, and for a period of 30 days following that proclamation or declaration, it is unlawful for a person, contractor, business, or other entity to sell or offer to sell any consumer food items or goods, goods or services used for emergency cleanup, emergency supplies, medical supplies, home heating oil, building materials, housing, transportation, freight, and storage services, or gasoline or other motor fuels for a price of more than 10 percent greater than the price charged by that person for those goods or services immediately prior to the proclamation or declaration of emergency.

Cal. Penal Code § 396(b). Such prices increases are only permitted under California Penal Code § 396(b) if they are "directly attributable to additional costs" imposed on the seller by an upstream supplier or due to "additional costs for labor or materials used to provide the services [] during the state of emergency or local emergency." *Id.*

61.     Any violation of California's price-gouging law is a misdemeanor offense, punishable by imprisonment up to a year, or a fine of up to $10,000, or both. *Id.* § 396(h).

62.     In addition, price gouging that violates California Penal Code § 396 is a per se "unlawful business practice and an act of unfair competition within the meaning of Section 17200 of the Business and Professions Code." *Id.* § 396(i).

63.     The price protections set forth in California Penal Code § 396 were triggered no later than February 3, 2020, when Santa Clara County declared California's first state of emergency relating to COVID-19. From that point forward, price increases anywhere in California exceeding the ten percent statutory threshold were presumptively unlawful. Subsequent declarations of emergency by local, state and federal officials—which issued in rapid succession over the ensuing months[85]—reinforced this statewide prohibition. Under the statutory scheme, a price increase of ten percent after one of the subsequent declarations of emergency was unlawful even if it would have been lawful under a prior declaration (for example, because the price went down during the interim period). *See id.* § 396(b).

---

[85] *See infra*, Part V.

64.     Under California Penal Code § 396(b), the prohibition on price gouging endures thirty days from each declared state of emergency. The prohibition can, however, be extended "for additional 30-day periods, as needed, by a local legislative body, local official, the Governor, or the Legislature, if deemed necessary to protect the lives, property, or welfare of the citizens." *Id.* § 396(g). By Executive Order N-44-20, dated April 3, 2020, Governor Newsom extended California's price-gouging prohibition for all products covered by § 396(b) until September 4, 2020.[86]

### *Amazon Price Increases During the COVID-19 Pandemic Were Unlawful*

65.     As the world's largest online retailer, Amazon maintains its own inventory of products which it sells directly to consumers, including in California. These Amazon-supplied products account for approximately 32 percent of the revenue from of all products sold on Amazon.[87] In addition, Amazon sells products provided by third-party suppliers. These third-party product sales account for approximately 68 percent of the sales revenue on the Amazon.com platform.[88]

66.     As the COVID-19 pandemic spread, Amazon's prices for many essential goods spiked dramatically, often by amounts that vastly exceeded the 10-percent threshold established under California law. In his March 4, 2020 letter to Amazon CEO Jeff Bezos, Senator Merkey described "disturbing news reports of coronavirus-inspired price gouging on Amazon.com," including that bottles of Purell hand sanitizer, "typically sold for less than $10 per box," were "listed at $400," and similarly inflated prices existed for face masks.[89] Senator Merkey explained that, as

---

[86] *See* https://www.gov.ca.gov/wp-content/uploads/2020/04/4.3.20-EO-N-44-20-text.pdf, last visited July 2, 2020. Executive Order N-44-20 further reinforces that sellers may not charge from April 4, 2020 until September 4, 2020, prices for protected goods that are higher "the highest price charged by that person or entity for that item on February 4 2020." Technically, under the statute, the price protection extends back to February 3, 2020, because that is the date of the first operative state-of-emergency declaration in California. The Executive Order does not purport to displace the statute in this respect. *See* Executive Order N-44-20 (stating that provisions are "[i]n addition to the prohibitions set forth in Penal Code section 396").

[87] *See* https://www.emarketer.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market, last visited July 2, 2020.

[88] *Id.*

[89] *See* https://www.markey.senate.gov/imo/media/doc/letter%20to%20Bezos%20re%20coronavirus%20price-gouging.pdf, last visited July 2, 2020.

"first steps," Amazon had announced the prior week that it had removed listings for price gouging and reiterated that third-party suppliers must comply with Amazon's "fair pricing policies," but that there had been "continued reports of price gouging and a lack of transparency," which left consumers exposed to unfair trade practices.[90] He referenced a third-party Amazon supplier whose goods were sold on Amazon and described Amazon's enforcement policy as "haphazard."[91]

67.     On March 11, 2020, the United States Public Interest Research Group Education Fund ("PIRG") published a study showing that prices for half of certain public-health products sold on Amazon—particularly, products in high demand during the COVID-19 crisis—had increased by more than 50 percent in February above their 90-day average.[92] These price increases were not limited to products supplied by third parties. Of the essential products PIRG evaluated, nearly one in six supplied by Amazon itself increased in price by more than 50 percent above the 90-day average.

68.     Referencing the PIRG study, Attorneys General from 33 states sent Amazon a letter on March 25, 2020, calling on Amazon to eliminate price gouging on its platform. The Attorneys General, including California's, noted that "[a]s COVID-19 spreads throughout the country, it is especially important unscrupulous sellers do not take advantage of Americans by selling products at unconscionable prices."[93] The letter implored Amazon to take action to abide by and enforce "the nation's consumer protection laws."[94]

69.     Other industry observers have analyzed Amazon's pricing data and concluded that Amazon "doubled its own prices on essential goods as the COVID-19 pandemic grew between early January and mid-March."[95] At one point in March, observers noted, Amazon "listed a four-pack of

---

[90] *Id.*

[91] *Id.*

[92] *See* https://uspirgedfund.org/resources/usf/analysis-coronavirus-spike-most-surgical-mask-sanitizer-prices-least-50-amazon, last visited July 1, 2020.

[93] *See* https://www.attorneygeneral.gov/wp-content/uploads/2020/03/03_25_2020_Multistate-letter.pdf, last visited July 2, 2020.

[94] *Id.*

[95] *See* https://www.10news.com/news/coronavirus/data-shows-amazon-raised-prices-during-pandemic-alongside-sellers-accused-of-price-gouging, last visited July 5, 2020.

its own brand of toilet paper for $72."[96] Consumers confirmed these unconscionable prices, reposting

the listings online hoping to warn others that Amazon itself was "participating in price gouging":[97]



70.     Although certain offending listings have been removed, Plaintiffs' independent

investigation has confirmed that Amazon has sold products at unlawfully inflated amounts during the

COVID-19 crisis, including before and after Amazon claimed to have cracked down on price

gouging, and Amazon continues to do so. Moreover, these price increases occurred both on products

supplied by third parties and on products supplied by Amazon. Unconscionable examples abound,

starting with price increases Amazon imposed on its own inventory of products:

---

[96] *Id.*

[97] *See*
https://www.reddit.com/r/mildlyinfuriating/comments/fiuwuo/amazon_themselves_participating_in_
price_gouging/, last visited July 5, 2020.

FIRST AMENDED CLASS ACTION COMPLAINT - 28
Case No.: 4:20-cv-02782-JSW

- **Aleve Back & Muscle Pain Tablet, Pain Reliever**: Increased *233 percent*, from $18.75 to $62.40, immediately after declared states of emergency, and has remained at that price to date.[98]



- **North 760008A Silicone Full Facepiece Respirators – Face Piece Only:** Increases of at least *47 percent*, from less than $170 to $251.02, following declared states of emergency.[99]



---

[98] *See* https://camelcamelcamel.com/product/B07WDK2Z85?context=search, last visited July 5, 2020.

[99] *See* https://camelcamelcamel.com/product/B00142BRF0?context=search, last visited July 5, 2020.

- **Faraon Black Beans, 4 lb:** Increases up to *166 percent*, from $4.98 to $13.26, following declared states of emergency.[100]



- **Germ Guardian Plugable Air Purifier & Sanitizer:** Increases exceeding *49 percent*, from less than $35 to $52.27, following declared states of emergency.[101]



---

[100] *See* https://camelcamelcamel.com/product/B07BBW3N81?context=search, last visited July 5, 2020.

[101] *See* https://camelcamelcamel.com/product/B000G2BESO?context=search, last visited July 4, 2020.

- **Annie Chun's Cooked White Sticky Rice:** Increases of up to ***119 percent***, from $7.96 to $17.40, following declared states of emergency.[102]



71. Additional presumptively unlawful price increases on Amazon's own inventory of products following declared states of emergency include, but are not limited to, the following:

| OTHER PRICE INCREASES ON AMAZON INVENTORY DURING THE COVID-19 PANDEMIC | |
|---|---|
| **PRODUCT** | **PRICE INCREASE** |
| Clorox Hydrogen Peroxide Disinfecting Wipes | ***~200%***[103] |
| Cottonnell Flushable Wet Wipes | ***156%***[104] |
| Hibiclens Antibacterial / Antiseptic Skin Cleanser | ***~122%***[105] |
| Aleve Arthritis Cap Pain Relief | ***117%***[106] |

---

[102] *See* https://camelcamelcamel.com/product/B000GPTC8U?context=search, last visited July 4, 2020.

[103] *See* https://camelcamelcamel.com/product/B00K3U1B64?context=search, last visited July 4, 2020.

[104] *See* https://camelcamelcamel.com/product/B07B46WWN2, last visited July 4, 2020.

[105] *See* https://camelcamelcamel.com/product/B00EV1D79A?context=search, last visited July 4, 2020.

[106] *See* https://camelcamelcamel.com/Aleve-Arthritis-Naproxen-Reliever-Headache/product/B07ZV5V19T, last visited July 5, 2020.

| | |
|---|---|
| Dynarex Alcohol Prep Pad | ~107%[107] |
| GoYoga Yoga Mat | ~99%[108] |
| Spectrum Essential Organic Ground Flaxseed | 66%[109] |
| StarKist Chunk Light Tuna in Water | ~66%[110] |
| Meyenberg Whole Powdered Goat Milk | 58%[111] |
| Ice Mountain 199% Natural Spring Water | 37%[112] |
| KIND Bars, Dark Chocolate Nuts & Sea Salt | 36%[113] |
| Medline Iodine Pads | ~34%[114] |
| Tide PODS Free and Gentle Laundry Detergent | 30%[115] |
| Barbara's Puffins Original Cereal | 25%[116] |
| 3M Full Facepiece Reusable Respirator 6700 | ~22%[117] |
| Immunityaid Support Blend | ~19%[118] |

72. In addition to increasing prices on its own inventory during the COVID-19 pandemic, Amazon sold third-party-supplied products at prices that vastly exceeded California's 10-percent statutory threshold and, by taking a share of the transaction proceeds, profited from the excess. Just by way of example:

---

[107] *See* https://camelcamelcamel.com/product/B005BFL0RQ, last visited July 4, 2020.

[108] *See* https://camelcamelcamel.com/product/B01IZDFWY2, last visited July 4, 2020.

[109] *See* https://camelcamelcamel.com/product/B00DOKFLYI, last visited July 4, 2020.

[110] *See* https://camelcamelcamel.com/product/B00FWUO2IE, last visited July 4, 2020.

[111] *See* https://camelcamelcamel.com/product/B004K69OMU?context=search, last visited July 4.

[112] *See* https://camelcamelcamel.com/Ice-Mountain-Natural-8-ounce-plastic/product/B01KCNJHYO, last visited July 4, 2020.

[113] *See* https://camelcamelcamel.com/product/B07PMTGM3C?context=search, last visited July 4, 2020.

[114] *See* https://camelcamelcamel.com/product/B075KKP2BR?context=search, last visited July 4, 2020.

[115] *See* https://camelcamelcamel.com/product/B07JMK7STT?context=search, last visited July 4, 2020.

[116] *See* https://camelcamelcamel.com/product/B00NTMVN0W?context=search, last visited July 4, 2020.

[117] *See* https://camelcamelcamel.com/product/B007JZ1K1C?context=search, last visited July 4, 2020.

[118] *See* https://camelcamelcamel.com/product/B06XCRKTRR?context=search, last visited July 4, 2020.

- **Disposable 3-Layer Masks:** Increase of *1,800 percent*, from $4.21 to $79.99, following declared states of emergency.[119]



- **Arm & Hammer Pure Baking Soda, 5 lb.:** Increase of approximately *1,400 percent*, from $2.00 to $29.99, following declared states of emergency.[120]



---

[119] *See* https://camelcamelcamel.com/product/B07W13JQW9, last visited July 4, 2020.

[120] *See* https://camelcamelcamel.com/product/B00HNSJSX2, last visited July 4, 2020.

- **Dynarex Corporation Surgical Procedure Masks**: Increase of ***376 percent***, from $11.71 to $55.78, following declared states of emergency.[121]



- **Disposable Earloop Face Masks**: Increases exceeding ***500 percent***, from less than $20 to $120, following declared states of emergency.[122]



---

[121] *See* https://camelcamelcamel.com/Dynarex-Corporation-2201-50-Surgical-Procedure/product/B00QO4MKN6?context=search, last visited July 4, 2020.

[122] *See* https://camelcamelcamel.com/product/B078718WVB?context=search, last visited July 4, 2020.

- **Cold-EEZE Cold Remedy Lozenges Honey Lemon:** Increases of at least ***620 percent***, from less than $5.00 to $35.99, following declared states of emergency.[123]



- **Goya Black Beans Dry 14 oz.:** Increases up to ***673 percent***, from $3.17 to $24.50, following declared states of emergency.[124]



[123] *See* https://camelcamelcamel.com/product/B000KOPX4O?context=search, last visited July 4, 2020.

[124] *See* https://camelcamelcamel.com/product/B00IMLRH9G?context=search, last visited July 4, 2020.

- **King Arthur Flour:** Increases up to ***400 percent***, from $22.00 to $110.00, following declared states of emergency.[125]



- **Logitech HD Pro Webcam C920:** Increase of at least ***431 percent***, from less than $65 to $345, following declared states of emergency.[126]



---

[125] *See* https://camelcamelcamel.com/product/B078P9TBNW?context=search, last visited July 4, 2020.

[126] *See* https://camelcamelcamel.com/product/B006JH8T3S, last visited July 4, 2020.

- **Signature's Dried Plums Pitted Prunes, 3.5 lbs.:** Increases up to ***159 percent***, from $10.99 to $24.87, following declared states of emergency.[127]



73.     Additional presumptively unlawful price increases on third-party supplied Amazon sales include, but are not limited to, the following:

| OTHER PRICE INCREASES ON THIRD-PARTY SUPPLIED PRODUCTS DURING THE COVID-19 PANDEMIC | |
| --- | --- |
| **PRODUCT** | **PRICE INCREASE** |
| Lysol Disinfecting Wipes | ***1,421%***[128] |
| Advil Coated Tablets Pain Reliever and Fever Reducer | ***~683%***[129] |
| Nishiki Medium Grain Rice | ***~602%***[130] |
| StarKist Chunk Light Tuna in Water | ***417%***[131] |
| Barilla Pasta, Spaghetti | ***~349%***[132] |

[127] *See* https://camelcamelcamel.com/product/B0051JL6OY?context=search, last July 4, 2020.

[128] *See* https://camelcamelcamel.com/product/B00Q70RCW6, last visited July 3, 2020.

[129] *See* https://camelcamelcamel.com/product/B0000VLK4O, last visited July 3, 2020.

[130] *See* https://camelcamelcamel.com/product/B00852ZN2U, last visited July 3, 2020.

[131] *See* https://camelcamelcamel.com/product/B00FWUO2IE?context=search, last visited July 3, 2020.

[132] *See* https://camelcamelcamel.com/product/B00WBGKJPW?context=search, last visited July 3, 2020.

| | |
|---|---|
| Kraft Easy Mac Microwavable Macaroni and Cheese | ~325%[133] |
| Curad Alcohol Prep Pads | 317%[134] |
| Kraft Macaroni & Cheese | 315%[135] |
| Cottonelle Toilet Paper (36 Family Plus Rolls) | ~233%[136] |
| Almond Milk | 229%[137] |
| Chef Boyardee, Spaghetti & Meatballs | 229%[138] |
| Planters Salted Peanuts (48 Pack) | ~216%[139] |
| Asian Best Jasmine Rice | 203%[140] |
| Quilted Northern Ultra Plush Toilet Paper 18 Rolls | ~196%[141] |
| Bounty Select-A-Size Paper Towels | 185%[142] |
| Kirkland Signature Dried Cherries, 20 Ounce | 109%[143] |
| Elder Berry Whole, dried 1lb | 108%[144] |
| Healthful Home Disinfectant/Cleaner | 100%[145] |
| Better Than Bouillon Organic Chicken Base | ~87%[146] |
| Raven Powder-Free Disposable Black Nitrile 6 Mi. Gloves | ~84%[147] |

[133] *See* https://camelcamelcamel.com/product/B005ECO3H0, last visited July 3, 2020.

[134] *See* https://camelcamelcamel.com/product/B00KOSP454, last visited July 3, 2020.

[135] *See* https://camelcamelcamel.com/product/B011W21U0I?context=search, last visited July 3, 2020.

[136] *See* https://camelcamelcamel.com/product/B07BWCT6YG, last visited July 3, 2020.

[137] *See* https://camelcamelcamel.com/product/B07HL1NRGQ?context=search, last visited July 3, 2020.

[138] *See* https://camelcamelcamel.com/product/B004XVZG1U?context=search, last visited July 3, 2020.

[139] *See* https://camelcamelcamel.com/product/B004TPU7LO, last visited July 3, 2020.

[140] *See* https://camelcamelcamel.com/product/B019VPL9OK?context=search, last visited July 3, 2020.

[141] *See* https://camelcamelcamel.com/product/B07F1KLYVH, last visited July 3, 2020.

[142] *See* https://camelcamelcamel.com/product/B010OW4KMW, last visited July 3, 2020.

[143] *See* https://camelcamelcamel.com/product/B004CSGRS0?context=search, last visited July 3, 2020.

[144] *See* https://camelcamelcamel.com/product/B076JMVSW5?context=search, last visited July 3, 2020.

[145] *See* https://camelcamelcamel.com/product/B00IGGVAEU?context=search, last visited July 4, 2020.

[146] *See* https://camelcamelcamel.com/product/B00415IRQO?context=search, last visited July 3, 2020.

[147] *See* https://ca.camelcamelcamel.com/product/B002XXO5US?context=search, last visited July 3, 2020.

| | |
|---|---|
| The Wild Mushroom Co. Dried Gourmet Mix | *~82%*[148] |
| Kirkland Signature Ibuprofen Liquid Softgels | *81%*[149] |
| Litsfit Resistance Exercise Bands | *~63%*[150] |
| Philippine Dried Mangoes | *61%*[151] |
| Kirkland Almonds | *58%*[152] |
| Gerbs Super 5 Dried Fruit Mix | *47%*[153] |
| Kirkland Signature Fancy Mixed Nuts | *47%*[154] |
| Tea Tree oil Active Wipes | *43%*[155] |
| Immunity Boost Supplement with Elderberry | *32%*[156] |
| Anti-Viral Plus Topical Patches | *25%*[157] |
| Turboforte – Lung Expansion, Mucus Relief Device | *23%*[158] |

### *Amazon is Responsible for Unlawful Price Increases on All Products Sold on its Platform*

74.     Amazon is accountable for unlawfully increasing the prices on its own inventory of products during the COVID-19 crisis. Amazon is also legally responsible for price gouging on the third-party products it sells. Far from serving as passive intermediary, Amazon controls the sale of all third-party products on its platform and receives a portion of the transaction proceeds, typically

---

[148]*See* https://camelcamelcamel.com/product/B075NVDRLY?context=search, last visited July 3, 2020.

[149] *See* https://camelcamelcamel.com/product/B000VK2QPQ?context=search, last visited July 3, 2020.

[150] *See* https://camelcamelcamel.com/product/B07CZYTLQN, last visited July 3, 2020.

[151] *See* https://camelcamelcamel.com/product/B000Q5NSAS?context=search, last visited July 3, 2020.

[152] *See* https://camelcamelcamel.com/product/B07913JFQK?context=search, last visited July 3, 2020.

[153]*See* https://camelcamelcamel.com/product/B00EQA93OY?context=search, last visited July 3, 2020.

[154] *See* https://camelcamelcamel.com/product/B077LZ2JQH?context=search, last visited July 3, 2020.

[155] *See* https://camelcamelcamel.com/product/B07RCG7NW5?context=search, last visited July 3, 2020.

[156] *See* https://camelcamelcamel.com/product/B081BCHH9V?context=search, last visited July 3, 2020.

[157] *See* https://camelcamelcamel.com/product/B082VHQ7QP?context=search, last visited July 3, 2020.

[158] *See* https://camelcamelcamel.com/product/B07QMB7MFZ?context=search, last visited July 3, 2020.

around 15 percent of the sales price (in addition to assessing recurring fees on third-party suppliers).[159]

75.     Amazon's control over third-party products extends to pricing. For certain third-party products, Amazon retains complete control of the prices at which they are offered. In particular, third-party suppliers who enroll in Amazon's "Sold by Amazon" ("SBA") program are guaranteed a "hands off the wheel selling experience," through which Amazon retains absolute discretion to price and reprice third-party inventory however Amazon sees fit. In the SBA program, the third-party supplier is guaranteed revenue from the sale of its product on Amazon.com based on the Minimum Gross Proceeds ("MGP") price, which Amazon sets unilaterally. Moreover, whatever the MGP price may be, *the price listed for and sold to the Amazon consumer* is set solely by Amazon, and may be more or less than the MGP price—it is controlled by Amazon.[160]

76.     In other cases involving "large or strategic" third-party suppliers, Amazon also negotiates all pricing terms,[161] or negotiates most-favored-nation protections assuring that third-party suppliers to do undercut Amazon's prices when offering their products through other retail outlets.[162]

77.     Amazon also offers third-party suppliers "Automated Pricing" services, whereby Amazon will automatically adjust the prices for third-party supplied products based on preset "rules" Amazon makes available to the suppliers.[163] With Automated Pricing, Amazon generally adjusts the pricing of third-party products to match or stay in some relationship to competitor prices.[164] This service coordinates pricing across Amazon's platform. If competitive benchmarks increase for any reason—including price gouging—Amazon adjusts all automatically priced products accordingly

---

[159] *See* https://www.junglescout.com/blog/amazon-fba-fees/, last visited July 5, 2020.

[160] *See* https://www.ecomcrew.com/the-amazon-sba-program-aka-sold-by-amazon/, last visited July 2, 2020.

[161] *See* https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-20190716-SD038.pdf, at 23 (last visited July 2, 2020).

[162] *See id*. at 1.

[163] *See* https://sellercentral.amazon.com/gp/help/external/help-page.html?itemID=201995750&language=en_US&ref=efph_201995750_bred_G202015620, last visited July 2, 2020.

[164] *See id.*

across its ecosystem. That also means that if Amazon were concerned that certain products supplied by third parties and covered by price-gouging laws were being inflated compared to pre-emergency prices, it could have turned off its automatic repricing software that set prices for specific products and sales beyond lawful limits.

78.     Even in instances where third-party suppliers retain some authority to set prices, Amazon establishes the price ceiling and retains the ultimate right to reject a price. As discussed previously, Amazon has a "fair pricing policy" pursuant to which it "regularly monitors the prices" set by third-party suppliers.[165] If Amazon identifies a price it considers too high relative to other prices (on or off Amazon's platform), Amazon may, among other things, remove the offer or suspend the seller.[166] Amazon may also remove the product from the "Buy Box" (discussed *infra*), the vehicle through which nearly all Amazon products are sold.[167] Moreover, because Amazon's Buy Box algorithm considers, among other things, the location of the consumer, Amazon could have monitored and limited pricing to comply with state law requirements (while third-party suppliers cannot).[168] Amazon also polices the price ceiling by suggesting that third-party sellers lower their prices.[169] In other instances, Amazon will unilaterally reduce the price of third-party supplied products by providing the consumer with a "discount, which appears as a credit" in the consumer's account.[170] These "discounts" are provided exclusively by Amazon, not the third-party supplier.

79.     Beyond pricing, Amazon controls all other aspects of transactions involving third-party supplied products. Consumers who purchase third-party products generally have no direct interaction with the third-party suppliers. Amazon promotes the products on its website, the contents of which Amazon controls entirely. Pursuant to the Amazon Services Business Solutions Agreement,

---

[165] *See* https://sellercentral.amazon.com/gp/help/external/G5TUVJKZHUVMN77V, last visited July 2, 2020.

[166] *See id.*

[167] *See id.*; *see also* https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-20190716-SD038.pdf, at 23 (last visited July 2, 2020).

[168] *See id.*

[169] *See id.* at 1.

[170] *See id.* at 25.

which third-party suppliers are required to sign to have their products sold on Amazon.com, "Amazon has the right to determine, the design, content, functionality, availability and appropriateness of its websites, selection, and any product or listing in the Amazon Stores, and all aspects of each Service, including [a third-party supplier's] use of the same. Amazon may assign any of these rights or delegate any of its responsibilities."[171] The Agreement also grants Amazon a royalty-free, non-exclusive, worldwide right and license to commercially or non-commercially exploit in any manner, the information provided by third-party suppliers.[172]

80.     When a consumer purchases a third-party supplied product, Amazon collects the order, shipping, and payment information from the customer, and it processes all payments. Amazon maintains the right to use mechanisms to rate, or allow shoppers to rate, these products and suppliers and to make the ratings publicly available, which it frequently does at the time the consumer is considering purchase.[173]

81.     Most third-party supplied products sold by Amazon are "Fulfilled by Amazon" or "FBA." This means Amazon warehouses the products at its own storage facilities. Amazon maintains electronic records tracking this inventory, which it can comingle with its own.[174] When a customer orders an FBA product, Amazon packages and ships the product directly, while handling customer service aspects of the transaction.[175] Amazon handles returns and reserves the right to

---

[171] *See* https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US, at S-6, last visited July 2, 2020.

[172] *See id.* at 4.

[173] *See* https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US&ref=efph_G1791_cont_1791, at S.1.2, last visited July 2, 2020.

[174] *See* https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US&ref=efph_G1791_cont_1791, at F-4, last visited July 2, 2020.

[175] *See* https://www.junglescout.com/amazon-seller-report/, last visited July 2, 2020; *see also generally* Amazon Services Business Solutions Agreement, Fulfillment By Amazon Service Terms.

1    fulfill customer returns with *any* "returned Amazon Fulfillment Units."[176] Amazon unilaterally

2    determines which products may participate in the FBA program.[177]

3          82.    Amazon also reserves "sole discretion" to "cancel[]" listings of third-party suppliers'

4    products or "remov[e]" suppliers' listing privileges for violation of Amazon policies,[178] to

5    permanently "withhold any payments" to suppliers for engaging in, *inter alia*, "illegal activity" or

6    repeated violations of Amazon's "Program policies,"[179] and to "accept, calculate, and process

7    cancellations, returns, refunds, and adjustments for the benefit of customers."[180] Amazon prohibits

8    third-party suppliers from sending unsolicited communications to customers, mandates that all

9    communications must be sent through a service provided on the Amazon platform, and Amazon

10   keeps a record of all correspondence using this service.[181]

11         83.    Amazon also controls the entire "shopping experience" on its platform, using

12   proprietary ranking mechanisms to direct consumers to third-party products of Amazon's choosing.

13   When a consumer searches for a generic product on Amazon—for example, "bleach"—the search

14   results are curated and ranked by Amazon.[182]  As any seller might, Amazon gives particular products

15

16   _____

17        [176] *See*
     https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US&ref=efph_G1791_cont_
     1791, at F-6.2, last visited July 2, 2020.

18        [177] *See id.* at F-1.

19        [178] *See* https://sellercentral.amazon.com/gp/help/external/200832300?language=en-
     US&ref=mpbc_200832290_cont_200832300, last visited July 2, 2020.

20        [179] *See* https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US, at 2, last
     visited July 2, 2020.

21        [180] *See* id. at S-2.2.

22        [181] *See*

23   https://sellercentral.amazon.com/gp/help/external/help.html?itemID=G1801&language=en_US&ref=
     ag_G1801_cont_521, last visited July 2, 2020;
     https://sellercentral.amazon.com/gp/help/external/help.html?itemID=202125900&language=en_US

24   &ref=efph_202125900_relt_TV8NTY5RM6N9LUN, last visited July 2, 2020. Amazon also requires
     that its third-party suppliers release it and agree to indemnify, defend, and hold it harmless against

25   any claim, loss, damage, settlement, cost, expense, or other liability arising from, *inter alia*, sales of
     the suppliers' products. *See*

26   https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US, at 6.1, last visited July 2,
     2020.

27        [182] Janger & Twerski, *The Heavy Hand of Amazon: A Seller Not a Neutral Platform* (Oct. 2019),
     available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3467059 (last visited July 5, 2020).

28

prominence or "shelf space." Amazon does this not only by ranking search results, but also by assigning products certain designations, such as "Sponsored," or "Amazon's Choice," or "Best Seller," or "Amazon Prime."[183] The criteria for these designations is established by Amazon and, through them, Amazon places the weight of its brand and imprimatur behind particular third-party supplied products.

84.     Amazon also determines which supplier will "win" particular transactions, effectively allocating sales between itself and different third-party suppliers without any meaningful involvement (or even knowledge) of the consumer. Specifically, from Amazon's general search results page, consumers can click on a particular product of interest and then are directed to a separate page for that product. Many suppliers—including both Amazon and third-party suppliers—provide the same products on Amazon and all of these suppliers share the same individual product page. Amazon pushes consumers to particular suppliers through a "Buy Box" at the top right corner of the product page. The Buy Box includes "Add to Cart" and "Buy Now" buttons for the supplier Amazon has chosen.[184] Only one supplier controls the Buy Box at any given point in time, and when users click the "Add to Cart" or "Buy Now" button, they are buying from that Amazon-selected supplier.[185] Over 90 percent of sales on Amazon occur using the Buy Box.[186]

85.     Amazon allocates shares of the Buy Box such that the chosen supplier can change throughout the day. Thus, a consumer who clicks "Add to Cart" for a particular product at 6 a.m. may be purchasing a product supplied by Suppler X, while a consumer who clicks the same button for the same product at 6:30 a.m. may be purchasing a product from Supplier Y, or a product supplied by Amazon itself.[187] Thus, not only does Amazon control which supplied products will win

---

[183] *Id.* at 9-10.

[184] *Id*. at 14.

[185] *See* https://tinuiti.com/blog/amazon/win-amazon-buy-box/, last visited July 2, 2020.

[186] *Id.*

[187] Janger & Twerski, *The Heavy Hand of Amazon: A Seller Not a Neutral Platform* (Oct. 2019), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3467059, at 14 (last visited July 5, 2020).

transactions, and how many transactions Amazon itself will supply, Amazon allocates these shares down to the minute.

86.     Text at the bottom of the "Buy Box" gives consumers some information as to who the supplier may be. The text generally states either "(1) sold by [name of third party] and shipped by [name of third party]; (2) sold by [name of third party] and fulfilled by Amazon; or (3) sold and shipped by Amazon." But the reality is that Amazon substitutes freely between suppliers after the sale.[188] As noted above, most third-party supplied products are "Fulfilled by Amazon" or "FBA." By default, Amazon warehouses FBA products by product type, not by supplier. Unless a supplier opts out of this program, and Amazon makes it disadvantageous to do so, all products of the same type are "commingled."[189] Accordingly, when a consumer purchases, for example, Clorox Disinfecting Wipes from Amazon, Amazon will generally fulfill this order from its commingled stock of Clorox Disinfecting Wipes regardless of what "supplier" was identified at the time of sale. The actual product the consumer receives could thus be one supplied by *any* third-party supplier, *or* Amazon itself. And again, Amazon choses whose product the consumer will receive without any input from the consumer or third-party suppliers involved.

87.     For all of the foregoing reasons, Amazon functions as the "seller" of all third-party supplied products on its platform. Not only does Amazon control pricing—either by fixing the price point or a price ceiling—Amazon interacts directly with customers to execute transactions, promotes particular third-party supplied products, and often fulfils orders from a comingled stock. Amazon controls the entire shopping experience on its platform, regardless of who supplies the products sold. Amazon is responsible when it sells third-party supplied products at prices that exceed legal prohibitions on price gouging.

88.     Moreover, and for similar reasons, Amazon has (a) furnished the means for the sales of products supplied by third parties at unlawfully inflated prices, and (b) aided-and-abetted the third-party suppliers through active participation in their violations, all while profiting off the

---

[188] *Id.* at 13.

[189] *Id.*

price-inflated sales. As explained above, Amazon retains complete control over the content of its sales platform, Amazon.com, by contract. Amazon maintains significant control over interactions with customers and the processing of payments, and particularly with regard to those products "Fulfilled by Amazon," handles product distribution. Amazon approves the third-party suppliers whose products are permitted to be sold on Amazon, and Amazon reserves the right to remove these third parties and any listing for violation of Amazon's policies, which Amazon holds out as, *inter alia*, prohibiting price gouging. Amazon promotes the sales of products listed on its platform as described above, and facilitates the sales of products listed on the Amazon platform (products supplied by third parties and those supplied by Amazon), including by selecting eligibility for the Buy Box and identifying the Buy Box winner, based on a complex Amazon algorithm that takes into account, among other things, price, fulfillment, and the suppliers' rating.[190] Amazon has shoppers rate products and suppliers, maintains control over the data, and frequently makes the ratings available to consumers at the time they are contemplating purchase. Moreover, as explained *infra*, Amazon knew that third-party suppliers were engaging in price gouging on its platform. Nothing is sold on Amazon, at any price, without Amazon's essential and active participation.

89.     Even if Amazon were not the seller of certain third-party products, Amazon has a legal duty to prevent foreseeable harm arising from the use of its platform, including by third-party suppliers. Where Amazon had delegated some pricing authority to third parties, Amazon has an obligation to ensure that it does not offer those products for sale on its platform at legally excessive prices.

90.     It was utterly foreseeable that some of Amazon's third-party suppliers would excessively inflate prices during the COVID-19 crisis, including in California. Amazon's third-party suppliers have previously inflated prices to unlawfully capitalize on emergencies, most prominently during Hurricane Irma in 2017.[191] Moreover, wherever COVID-19 has spread, it has led to scarcity

---

[190] *See* https://tinuiti.com/blog/amazon/win-amazon-buy-box/, last visited July 2, 2020.

[191] *See* https://money.com/amazon-bottled-water-price-gouging-hurricane-irma-florida/, last visited July 2, 2020.

of essential consumer items and substantial price inflation. Amazon was on notice that the same dynamic would play out in California once the virus reached its shores, or even sooner.

91.     Price inflation on third-party supplied products was not only foreseeable; Amazon *knew* that it was occurring in real time and has claimed to have longstanding rules and systems to prevent and stop price gouging as a violation of its "fair pricing" policies (those claims, as shown in this First Amended Complaint, have been proven false). Amazon assiduously tracks pricing on its platform to best position itself in the marketplace. Amazon thus knew that California prices on third-party priced products were exceeding legal thresholds, often by unconscionable amounts, after California's first declared state of emergency on February 3, 2020. Amazon had an obligation to prevent this price gouging from occurring, and to stop it once it occurred, which Amazon could readily do by excising offending third-party suppliers and taking down excessively priced listings. Amazon retains contractual authority to take these very steps.[192]

92.     Amazon did not act, however, until late February, when it first began to suspend and take down some (but not close to all) products priced excessively by third parties.[193] Moreover, while Amazon's actions made for good publicity, they did not effectively address—much less eliminate—the problem. Amazon continued to sell third-party priced products at unconscionably inflated prices, as the examples cited in this First Amended Complaint demonstrate. Notably in this regard, after Amazon took its limited initial steps to address price gouging by third-party suppliers, Senator Markey commented on Amazon's claim that it was addressing price gouging, writing on March 4, 2020 that despite Amazon's purported efforts, there had been "continued reports of price gouging" on the platform.[194]

---

[192] *See* https://sellercentral.amazon.com/gp/help/external/G5TUVJKZHUVMN77V?language=en_US&amp;amp;ref=efph_G5TUVJKZHUVMN77V_cont_521, last visited July 2, 2020.

[193] *See* https://www.cnbc.com/2020/02/27/amazon-cracks-down-on-coronavirus-price-gouging-false-claims.html, last visited July 2, 2020.

[194] *See* https://www.markey.senate.gov/imo/media/doc/letter%20to%20Bezos%20re%20coronavirus%20price-gouging.pdf, last visited July 2, 2020.

93.     As public outcry swelled, Amazon was compelled on March 23, 2020 to suspend 3,900 United States accounts associated with products Amazon offered at excessive prices.[195] On that same date, Amazon issued a blog post stating that it has "zero tolerance for price gouging" and claimed to have had "longstanding policies and systems to prevent this harmful practice."[196] But those assertions already had been proven false with the gouging ramping up and ongoing for months. And Amazon's actions, even at that point, were again inadequate. Just two days later, 33 Attorneys General, including California's Attorney General Xavier Becerra, advised Amazon the "new protections" implemented by Amazon had "failed to remove unconscionably priced critical supplies during the COVID-19 pandemic."[197] To this day, third parties are pricing critical goods on the Amazon platform at unconscionable levels, and Amazon is selling those goods to consumers, including in California.

94.     Exercising reasonable care, Amazon should have had adequate systems in place long before COVID-19 reached California to monitor and eliminate price gouging on its platform. As 33 Attorneys General have advised, Amazon should not simply react to third-party price inflation—it should have policies to "prevent unconscionable price increases from occurring in the first place."[198] Amazon has the technology to and sophistication to do this. In a May 13, 2020 blog post, Amazon

---

[195] *See* https://www.usatoday.com/story/money/2020/03/23/coronavirus-amazon-price-gouging-removed-accounts/2904729001/, last visited July 2, 2020. In a letter to shareholders published on April 16, 2020, Amazon CEO Jeff Bezos indicated that Amazon had suspended "more than 6,000 selling accounts globally." https://www.sec.gov/Archives/edgar/data/1018724/000119312520108427/d902615dex991.htm, last visited July 2, 2020. The letter did not specify how many of these accounts were operating in the United States, or whether that number is any greater than the 3,900 United States accounts suspended previously.

[196] *See* https://blog.aboutamazon.com/company-news/price-gouging-has-no-place-in-our-stores, last visited July 2, 2020 (notably claiming to make clear to all of its sellers that it has policies to ensure "fair pricing," but providing no further specifics, including about the particular prohibitions under California Penal Code § 396). The Amazon Marketplace Fair Pricing Policy reflects this vagueness and provides no clear directions to third-party suppliers about the specific price increases that would, for example, violate California law. *See* https://sellercentral.amazon.com/gp/help/external/G5TUVJKZHUVMN77V, last visited July 2, 2020.

[197] *See* https://www.attorneygeneral.gov/wp-content/uploads/2020/03/03_25_2020_Multistate-letter.pdf, last visited July 2, 2020.

[198] *See id.*

FIRST AMENDED CLASS ACTION COMPLAINT - 48
Case No.: 4:20-cv-02782-JSW

acknowledged that it maintains "dynamic automated technology to proactively seek out and pull down unreasonably priced offers."[199] Amazon did not, however, deploy this system proactively to prevent price increases in violation of California's price-gouging law. Notably in this regard, Amazon acknowledged its automated pricing technology in an open letter to Congress advocating for national price-gouging laws that could supplant and soften California's standards—specifically, replacing California's strict ten-percent threshold for lawful price increases, with a "flexib[le]" standard barring only "unconscionable or grossly excessive or unconscionably excessive" increases.[200] Thus, beyond failing to deploy its systems to prevent price gouging in violation of California law, Amazon is pursuing federal legislation that would relieve it of that obligation.

95.     Ultimately, the most troubling aspect of Amazon's "efforts" to address third-party price gouging is not that they came late, or were ineffectual, or that Amazon profited on these sales, all of which is true; it is that while Amazon actively publicized these efforts, Amazon itself continued to sell its own inventory of products at prices that vastly exceeded California's threshold for illicit price gouging. Plaintiff Julie Hanson's purchase, detailed above, is illustrative in these regards. As COVID-19 spread, the price of third-party supplied Zodiac Flea and Tick spray increased from $12.31 to $14.18 (inclusive of shipping), a 15-percent jump that exceeds California's 10-percent price-gouging threshold. Rather than remove these listings or cap prices at lawful levels, Amazon increased the price of its own supply of the same product by 58 percent to $14.19—one cent above the third-party suppliers. Amazon also assigned *itself* the Buy Box, where nearly all Amazon purchases are made, ensuring that consumers who clicked "Buy Now" would be buying an Amazon-supplied product at a price far above what California law permits.

### ***Amazon Has Price-Gouged Its Way to Unprecedented Revenues During the COVID-19 Crisis***

96.     With rampant price gouging, Amazon has exploited unprecedented consumer demand during the COVID-19 to reap extraordinary profits. Amazon's 2020 first-quarter net sales reached

---

[199] *See* https://blog.aboutamazon.com/policy/its-time-for-congress-to-establish-a-federal-price-gouging-law?ots=1&slotNum=0&imprToken=08b928c6-6c88-5b1d-1a0&tag=curbedcom06-20&linkCode=w50, last visited July 2, 2020.

[200] *Id.*

$75.5 billion, up 26 percent from the first quarter of 2019.[201] This means that through the first quarter Amazon had generated $10,000 every second of every day in 2020.

97.     Despite the stock market's collapse in 2020, there has never been a better to time to be an Amazon shareholder. As one leading analyst stated in April 2020:

> [Amazon] has achieved a feat that many investors on Wall Street would regard as impossible in a stock market that's fallen sharply off its highs this year. Amazon's shares have soared more than 40% in the past month alone to a new record high as of early afternoon trading on Thursday, giving the company a market value of more than $1.2 trillion.[202]

98.     Jeff Bezos, Amazon's president and CEO, has seen his personal fortune swell during the COVID-19 pandemic. Among other assets, Mr. Bezos owns an 11.2 percent stake in Amazon. On April 14 alone, when Amazon stock surged more than 5 percent, Mr. Bezos's fortune grew by some $6.3 billion. During the height of the COVID-19 crisis, between March 23, 2020 and May 23, 2020, Mr. Bezos's net worth increased by $30 billion.[203]

## V.     CLASS ACTON ALLEGATIONS

99.     Plaintiffs bring this proposed action on behalf of themselves and, pursuant to Rules 23(a), 23(b)(2) & 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (collectively, the "Class"):

> All persons who purchased in California any Protected Product on Amazon.com on or after February 4, 2020 at a price 10 percent greater than the price charged on Amazon.com for the same Protected Product (a) on February 2, 2020, or (b) immediately prior to any declaration of a State of Emergency relating to the COVID-19 crisis.

6.     The following definitions apply to the Class definition:

- "**State of Emergency**" means any emergency relating to COVID-19 or the novel coronavirus declared by (a) the President of the United States, (b) the Governor of California, or (c) any official, board, or other governing body vested with authority to

---

[201] *See* https://s2.q4cdn.com/299287126/files/doc_financials/2020/Q1/Amazon-Q1-2020-Earnings-Release.pdf, last visited July 2, 2020.

[202] *See* https://www.investopedia.com/amazon-earnings-4692665, last visited July 2, 2020.

[203] *See* https://www.forbes.com/sites/jonathanponciano/2020/05/22/billionaires-zuckerberg-bezos/#28e54b387ed6, last visited July 2, 2020.

make that declaration in any county, city, or city and county in California. States of Emergency were declared on at least the following dates:

- o February 3, 2020: Santa Clara County
- o February 14, 2020: San Diego County
- o February 25, 2020: San Francisco (Mayor's Declaration)
- o February 26, 2020: Orange County
- o February 27, 2020: Solano County
- o March 1, 2020: Alameda County
- o March 2, 2020: Sonoma County
- o March 3, 2020: Placer County; Mariposa County; Marin County
- o March 4, 2020: California (Governor Newsom); Los Angeles County; Mendocino County; Nevada County; Santa Cruz County
- o March 5, 2020: Sacramento County; Imperial County
- o March 6, 2020: City and County of San Francisco; Butte County; Yolo County; San Benito County; Monterey County
- o March 8, 2020: Riverside County
- o March 9, 2020: Lake County
- o March 10, 2020: Contra Costa; Calaveras County; Sutter; Yuba; San Bernardino County
- o March 11, 2020: Humboldt County; Stanislaus County
- o March 12, 2020: El Dorado County; Amador County; Napa County; Santa Barbara County; Ventura County; San Joaquin County
- o March 13, 2020: United States (President Trump); Merced County; Modoc County; San Luis Obispo County
- o March 15, 2020: Fresno County; Mono County
- o March 16, 2020: Kern County; Inyo County; Madera County; Plumas County
- o March 17, 2020: Kings County; Shasta County; Siskiyou County; Tehama County; Tuolumne County

1      ○  March 18, 2020: Colusa County

2      ○  March 19, 2020: Alpine County

3      ○  March 20, 2020: Lassen County; Sierra County

4      ○  March 24, 2020: Del Norte County

5     ●  "**Protected Product**" means all consumer food items or goods, goods or services

6       used for emergency cleanup, emergency supplies, medical supplies, home heating oil,

7       building materials, housing, transportation, freight, and storage services, or gasoline

8       or other motor fuels. *See* Cal. Penal Code § 396(b).[204]

9    100.  Plaintiffs reserve the right to revisit the Class definition based upon information

10 learned through discovery.

11    101.  Excluded from this proposed Class are Defendant; Defendant's affiliates and

12 subsidiaries; Defendant's current or former employees, officers, directors, agents, and

13 representatives; and the district judge or magistrate judge to whom this case is assigned, as well as

14 those judges' immediate family members.

15    102.  This action may appropriately proceed as a class action because Plaintiffs seek

16 injunctive relief that will apply to the Class as a whole and, further, because Plaintiffs will prove the

17 elements of their damages claims with predominantly common evidence.

18    103.  **Numerosity:** The proposed Class includes thousands (and potentially millions) of

19 consumers who paid unlawfully inflated prices for products on Amazon.com. The members of this

20 Class are so numerous that individual joinder of all Class members is impracticable. The precise

21 number of Class members is not available to Plaintiffs at this time, but the number and identity of

22 individual Class members can be ascertained from Amazon's books and records.

23    104.  **Commonality and Predominance:** Numerous questions of law and fact are common

24 to the claims of the Plaintiffs and members of the proposed Class, and these common questions

25

26

27    [204] This definition incorporates all defined terms in California Penal Code § 396(j), including but not limited to those for "building materials," "consumer food items," emergency supplies," "gasoline," and "goods."

28 FIRST AMENDED CLASS ACTION COMPLAINT - 52
  Case No.: 4:20-cv-02782-JSW

predominate over any questions affecting only individual Class members. These include, but are not limited to:

   (a) Whether Amazon inflated prices in California during the COVID-19 pandemic;

   (b) Whether those price increases were in excess of 10 percent on products protected under California Penal Code § 396;

   (c) Whether Amazon's price increases occurred after qualifying declared states of emergency in California under California Penal Code § 396;

   (d) Whether Amazon unlawfully increased prices on its own inventory of products;

   (e) Whether Amazon is liable for price increases on products supplied by third-parties;

   (f) Whether Amazon exercised reasonable care to monitor and prevent price inflation by third-party Amazon suppliers;

   (g) Whether and the extent to which consumers in California were harmed by unlawful price increases on Amazon;

   (h) The extent to which Amazon was enriched unjustly;

   (i) Whether Amazon should be subjected to punitive damages, and the appropriate amount; and

   (j) Whether Plaintiffs are entitled to injunctive relief and the appropriate scope of any equitable decree.

105. **Typicality:** Plaintiffs' claims are typical of the claims of all Class members because, among other things, all Class members were comparably and similarly injured by Amazon's wrongful conduct alleged herein. Plaintiffs, like all Class members, purchased products from Amazon at prices that were unlawfully inflated during the COVID-19 pandemic.

106. **Adequacy**: Plaintiffs will represent and protect the interests of the proposed Class adequately and fairly. Plaintiffs have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Class,

and their interests do not conflict with the interests of the proposed Class members they seek to represent.

107.    **Injunctive and declaratory relief:** By way of the conduct described in this First Amended Complaint, Defendant has acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

108.    **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in its management. Even if members of the proposed Class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class-action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200)

109.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

110.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice."

111.    Any violation of California Penal Code § 396 "constitute[s] an unlawful business practice and an act of unfair competition within the meaning of Section 17200 of the Business and Professions Code." Cal. Penal Code § 396(i).

112.    As set forth herein, Amazon violated California Penal Code § 396(b) because, after states of emergency were declared in California in relation to COVID-19, Amazon sold and offered to sell Protected Products at prices "10 percent greater" than the price Amazon charged "immediately prior to the proclamation or declaration of emergency." Cal. Penal Code § 396(b). The Protected

Products Amazon sold or offered to sell at statutorily excessive prices include "consumer food items or goods, goods or services used for emergency cleanup, emergency supplies, medical supplies, home heating oil, building materials, housing, transportation, freight, and storage services, or gasoline or other motor fuels." *Id.*

113.    On information and belief, Amazon's price increases were not directly attributable to additional costs imposed on Amazon by the suppliers of the Protected Products, and Amazon increased prices on many Protected Products in excess of 10 percent even when accounting for any additional costs and the markup Amazon customarily applies to the Protected Products. *See id.* § 396(b).

114.    All products available on Amazon.com are sold or offered for sale by Amazon, and thus Amazon is liable under California Penal Code § 396(b), and the UCL, for all unlawful prices on its platform. This includes sales involving Amazon's own inventory of products. It also includes sales involving products supplied by third parties. Consumers purchasing third-party supplied products interact almost exclusively with Amazon, which, functioning as the seller for the purposes of § 396(b), controls virtually all aspects of the transaction, including by establishing a price ceiling, in many cases setting the specific selling price below that ceiling, and maintaining final authority to remove any product listing. Amazon promotes third-party supplied products on its platform, including by offering them for sale through its "Buy Box," and otherwise choosing to rank, curate, and give particular prominence to the sale of specific products. Amazon assert effective control over which supplied products will win transactions, how many products Amazon itself will supply, and Amazon allocates these shares down to the minute. Amazon accepts payment when they are purchased and handles all material aspects of the transaction. As with any seller, Amazon profits when it sells third-party supplied products, collecting per-transaction and other fees. And because Amazon's fees are tied to the purchase price, Amazon profits directly when third-party products are sold at higher prices.

115.    For all of these reasons, and as elaborated further herein, Amazon "sell[s] or offer[s] to sell" third-party supplied products within the meaning of California Penal Code § 396(b). In the alternative, or in addition, Amazon is liable under the UCL for products supplied by third parties

because Amazon (a) furnished the means for the violation of § 396(b) and (b) aided and abetted the third-party suppliers through active participation in their wrongdoing.

116.   Even in the absence of § 396(b), Amazon's excessive price increases during the COVID-19 crisis were unconscionable and unfair in violation of the UCL.

117.   As a direct and proximate result of Amazon's unlawful and unfair business acts and practices, Plaintiffs have suffered and will continue to suffer actual damages. Plaintiffs are entitled to injunctive relief and Amazon should be required to make full restitution to Plaintiffs and disgorge its unjust profits made as a result of such unlawful and unfair business acts and practices described above.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE AND NEGLIGENCE PER SE**

118.   Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

119.   Amazon has a non-delegable duty to apply a level of care commensurate with the foreseeable harms arising from its control, maintenance, and management of the largest online retail platform in the world. This encompasses a duty to ensure that, during a declared public emergency, consumer products, medical supplies, emergency products and other Protected Products are not sold on the platform at excessive prices.

120.   As the COVID-19 crisis emerged in California in January 2020, and even prior, it was foreseeable that third-party suppliers on Amazon would inflate prices excessively for many goods essential to enduring and combatting the public health crisis. Such price inflation has occurred on Amazon's platform in prior emergencies, and was occurring wherever COVID-19 spread. In proscribing price gouging, California's legislature specifically acknowledged its foreseeability, noting that during states of emergency, "merchants have taken unfair advantage of consumers by greatly increasing prices for essential consumer goods and services." Cal. Penal Code § 396(a).

121.   Amazon's duty to prevent price gouging in California during the COVID-19 pandemic is reinforced by California Penal Code § 396(b), which provides that, upon the declaration of a state of emergency by the president, governor, or local official, any price increase exceeding 10

percent on consumer goods, emergency supplies, medical supplies, and other products is presumptively unlawful.

122.    Amazon has the ability, technological capacity, and contractual right to prevent price gouging during a declared emergency. Amazon maintains complete control over its platform. It has oversight on the prices of all products sold on the platform and, by contract with its third-party suppliers, may unilaterally remove or suspend any listing priced excessively.

123.    Amazon, its agents, servants, and/or employees, failed to exercise ordinary care and failed to comply with existing standards of care in the following acts and/or omissions:

- Failing to maintain and/or implement systems to detect price increases by third-party suppliers in excess of California's statutory threshold;

- Failing to remove (or timely remove) product listings priced above California's statutory threshold by third-party suppliers;

- Failing to remove from the Amazon platform (or timely remove) third-party suppliers engaged in unlawful price gouging;

- Failing to adequately investigate reports of excessive price inflation on third-party supplied products; and

- Delegating pricing authority to third-party suppliers while failing to adequately inform them of California legal threshold for price increases during declared states of emergency.

124.    Given the foreseeability of price gouging during the COVID-19 pandemic, a reasonable online retailer in Amazon's position would have had systems in place to prevent price gouging from ever occurring, and would have taken prompt aggressive steps to stamp it out entirely. Amazon did not do so. Despite Amazon's vast resources and sophistication, it lacked or failed to implement systems to prevent unlawful price increases on third-party supplied products, and the acts Amazon ultimately did take to address price gouging came far too late, and were ineffectual.

125.    Amazon knew that, because of its failure to exercise reasonable care, consumers such as Plaintiffs would be overcharged.

126.    Amazon's actions and omissions resulted in thousands, if not millions, of violations of California's price gouging statute. *See* Cal. Penal Code § 396(b). This law was designed to protect Plaintiffs and similarly situated persons from the economic injuries they have suffered. Accordingly, Amazon's conduct constitutes negligence per se.

127.    Amazon's negligence was the proximate cause and substantial factor in causing Plaintiffs' economic loss. Had Amazon exercised reasonable care, Plaintiffs would not have paid excessive amounts for products they purchased from Amazon. Plaintiffs are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT

128.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

129.    Amazon has exploited vulnerable consumers by selling, and offering for sale, products at excessive prices during COVID-19 pandemic. Facing retail scarcity, and official warnings as to the risks of public interaction, consumers have turned to Amazon as a lifeline to obtain goods vital to their safety, health, and well-being. California law, and basic principles of equity and fair dealing, prohibit sellers from capitalizing on such exigencies to charge consumers excessive prices.

130.    By selling consumer goods, emergency supplies, medical equipment and other essential products in California at excessive and inflated prices during the COVID-19 pandemic, Amazon was unjustly enriched. Amazon profited on both the sale of its own inventory as well as products supplied by third-parties, for which Amazon retains a portion of the transaction proceeds. All of these inflated profits were conferred by California consumers, and retained unjustly by Amazon.

131.    In selling goods at excessive prices during a public health crisis, Amazon knew that it was overcharging consumers, that consumers would be harmed, and that by retaining the sale proceeds Amazon would be unjustly enriched.

132.    In the event Plaintiffs lack an adequate remedy at law, Amazon is required to make restitution in equity pursuant to the common law of unjust enrichment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief on their own behalf and on behalf of all those similarly situated:

A.      That the Court certify the proposed Class and appoint Plaintiffs as Class representatives and their counsel as Class counsel;

B.      That the Court award them and the proposed Class all appropriate relief, to include, but not be limited to damages, restitution, and public injunctive relief prohibiting Amazon from forever engaging in the wrongful conduct alleged herein, which has harmed Plaintiffs, the Class, and the public at large;

C.      That the Court grant such additional orders or judgments as may be necessary to remedy or prevent the unlawful practices complained of herein;

D.      That the Court award them and the proposed Class reasonable attorneys' fees, costs, and pre- and post-judgment interest;

E.      That the Court impose punitive damages; and

F.      That the Court award them and proposed Class such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  July 6, 2020                    Respectfully submitted,

                                        HAGENS BERMAN SOBOL SHAPIRO LLP

                                        By /s/ Steve W. Berman

                                        Steve W. Berman (admitted *pro hac vice*)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1301 Second Avenue, Suite 2000
                                        Seattle, Washington  98101
                                        Telephone: (206) 623-7292
                                        Facsimile: (206) 623-0594
                                        Email: steve@hbsslaw.com

                                        Ben Harrington (313877)
                                        Benjamin J. Siegel (256260)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        715 Hearst Avenue, Suite 202
                                        Berkeley, California  94710

Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
Email: benh@hbsslaw.com
Email: bens@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*